NATIONAL OPERATING, L.P., Plaintiff-Appellant-Petitioner,

v.

MUTUAL LIFE INSURANCE COMPANY OF NEW YORK, and Bridgeview Plaza Partnership, Defendants-Respondents.

Supreme Court

*No. 99–1119. Oral argument January 3, 2001.—Decided July 3, 2001.*

2001 WI 87

(Also reported in 630 N.W.2d 116.)

For the plaintiff-appellant-petitioner there were briefs by *Mark F. Foley, G. Michael Halfenger, David W. Simon, Rebecca E.W. Wegner* and *Foley & Lardner*, Milwaukee, and oral argument by *Mark F. Foley*.

For the defendant-respondent, Mutual Life Insurance Company of New York, there was a brief by *Thomas M. Olejniczak, Robert M. Charles, Paula J. Lynch* and *Liebmann, Conway, Olejniczak & Jerry, S.C.*, Green Bay, and oral argument by *Thomas M. Olejniczak*.

For the defendant-respondent, Bridgeview Plaza Partnership, there was a brief by *Maureen L. Kinney* and *Johns, Flaherty & Rice*, La Crosse.

¶ 1. DAVID T. PROSSER, J. This is a review of an unpublished decision of the court of appeals,[1] affirming an order of the La Crosse County Circuit Court, Ramona A. Gonzalez, Judge. The case addresses the rights of a debtor in default under Article 9 (Secured Transactions) of the Uniform Commercial Code, both before and after a declaratory judgment obtained by the secured party to declare its rights in relation to the debtor.

¶ 2. To state the case briefly, National Operating, L.P. (National Operating), the debtor in default, filed suit against Mutual Life Insurance Company of New York (MONY) and Bridgeview Plaza Partnership (Bridgeview). During this litigation, National Operating moved for partial summary judgment. MONY and Bridgeview, in turn, moved to dismiss National Oper-

---

[1] *Nat'l Operating, L.P. v. Mut. Life Ins. Co. of N.Y.*, unpublished slip op. (Wis. Ct. App. Dec. 23, 1999).

ating's suit on the basis of claim preclusion resulting from a declaratory judgment obtained by MONY two years earlier. The circuit court denied National Operating's motion for partial summary judgment and granted the MONY/Bridgeview motions to dismiss. The court of appeals affirmed.

¶ 3. After carefully examining the rights of a debtor in default under Article 9 of the Uniform Commercial Code (U.C.C. or the Code), as well as the scope and claim preclusive effect of the declaratory judgment issued by the La Crosse County Circuit Court in 1996, we reverse.

## I. FACTS AND PROCEDURAL HISTORY

¶ 4. This case involves a series of commercial transactions among National Operating, MONY, and Bridgeview. National Operating is a Delaware limited partnership headquartered in Dallas, Texas. It is the successor to McNeil Real Estate Fund VII, Ltd., on a loan obligation to MONY.

¶ 5. MONY is a New York corporation that became the payee on a note assigned to it by the Trustees of MONY Mortgage Investors, the entity that lent money to McNeil Real Estate.

¶ 6. Bridgeview is an Illinois general partnership. It owns the Bridgeview Plaza shopping center in La Crosse.

¶ 7. In April 1978 National Operating borrowed $3,433,000 from MONY to purchase Bridgeview Plaza.[2] In return for MONY's loan, National Operating

---

[2] The actual parties to the April 1978 transaction were McNeil Real Estate Fund VII, Ltd. and the Trustees of MONY Mortgage Investors. The 1978 Mortgage Note contemplated the assignment of the Note from MONY Mortgage Investors to MONY. This assignment was made on December 12, 1978.

gave MONY a 30-year note (Underlying Note). The Underlying Note called for National Operating to make 359 monthly payments of $27,951 to MONY, beginning February 1, 1979,[3] plus a final payment of any remaining balance. However, MONY had the option of "calling" its loan and accelerating the repayment during the 15th loan year (1993).[4] MONY's loan was secured by a "Mortgage and Security Agreement" on Bridgeview Plaza. The security documents included an

National Operating later merged with McNeil Real Estate Fund VII, Ltd. For simplicity we will refer to the borrower and the lender in the April 1978 transaction as "National Operating" and "MONY," respectively.

[3] The Mortgage Note called for monthly interest payments from June 1, 1978 until the earliest of "(a) the first day of the first month following the endorsement and assignment of this Note to [MONY]; or (b) May 1, 1979." Monthly payments on the principal and interest would commence on the earliest of "(a) June 1, 1979 or (b) on the first day of the second month following the endorsement and assignment of this Note to [MONY]."

The first day of the first month after the December 12, 1978 assignment to MONY was January 1, 1979. Therefore the final interest payment was payable on January 1, 1979, and the initial payment on the principal and interest was payable on February 1, 1979.

[4] The pertinent paragraph of the Mortgage Note reads as follows:

> Borrower agrees that notwithstanding the scheduled maturity of this Note, Payee or the then holder of this Note shall have the right during the fifteenth Loan Year to call the loan and accelerate the maturity date of this Note by giving at least six (6) months written notice to Borrower prior to the date of such acceleration. In the event Payee or the then holder of this Note shall exercise such right, the unpaid principal balance of this Note, together with all interest accrued thereon, shall be due and payable in full, without prepayment premium, at the date specified by Payee or the then holder of this Note in the written notice to Borrower of the exercise of such right.

"Assignment of Leases and Rents" so that in the event of a default by National Operating, MONY would assume National Operating's "right, title and interest in, to and under all leases and agreements relating to the use or occupancy of the Premises."

¶ 8. In February 1990, after conferring with MONY, National Operating sold the shopping center to Bridgeview in exchange for a $5.5 million wrap-around note (Wrap Note) and a mortgage (Mortgage) on the property. This arrangement did not alter National Operating's debt to MONY. Rather, it required Bridgeview to make monthly interest payments on the Wrap Note to National Operating, and then a $5.5 million balloon payment on February 29, 2000.[5] Bridgeview's monthly interest payment to National Operating exceeded National Operating's monthly payment to MONY so that National Operating was able to retain a portion of Bridgeview's monthly payments. However, the Wrap Note did not authorize National Operating to "call" for a lump sum payment from Bridgeview before February 29, 2000, unless Bridgeview defaulted.

¶ 9. In 1993, during the 15th year of the first agreement, MONY called its loan. National Operating was unable to respond by tendering a full repayment of

---

[5] National Operating received payments from Bridgeview under the Wrap Note, and continued to make payments to MONY on the Underlying Note. No agreement existed between Bridgeview and MONY. This type of arrangement is typical in wrap-around notes. "Under wraparound financing, the purchaser makes an installment note which includes, or 'wraps around,' the principal balance of an underlying indebtedness. The purchaser expressly does not assume responsibility for the underlying indebtedness." *Summers v. Consol. Capital Special Trust*, 783 S.W.2d 580, 581 (Tex. 1990).

the balance ($2,832,861.91). Consequently, MONY considered foreclosing on the property, and National Operating considered filing for bankruptcy. Instead, the two parties agreed to renegotiate the loan. In November 1993, National Operating and MONY agreed to a "Loan Modification and Extension Agreement" (Loan Extension) and an "Assignment" (Assignment), both effective January 1, 1993, the date on which MONY's final payment had been due.

¶ 10. The Loan Extension increased the interest rate on the Underlying Note from 9 1/8 percent to 10 percent. In addition, National Operating agreed to pay MONY $100,000 toward the loan balance, a $25,000 loan extension fee, and MONY's legal costs of $5,725. In exchange, MONY agreed to extend the maturity date of the loan to December 31, 1995.

¶ 11. The Assignment from National Operating to MONY contained three paragraphs relevant to this case. The first relevant paragraph provided that National Operating assigned "all of its right, title and interest in those certain rights and remedies granted in the Wrap Note and Mortgage" by Bridgeview, to MONY. A second paragraph provided that at any time after default, MONY could exercise the rights and remedies granted in the Wrap Note and Mortgage at the same time and instance as National Operating would have been able to exercise them. The third relevant paragraph provided that upon payment of the Underlying Note and any amounts due under the underlying Mortgage, MONY was required to reconvey the Wrap Note and Mortgage on the shopping center to National Operating.

¶ 12. The Assignment was drafted by MONY. However, the paragraph about payment of the Underlying Note and reconveyance of the Wrap Note and

Mortgage was added at the request of National Operating.

¶ 13. In late 1995, aware that National Operating was having difficulty obtaining financing to pay off the soon-to-mature Underlying Note, MONY offered to extend the loan again, for another fee and another increase in the interest rate. On December 31, 1995, however, the Underlying Note matured without a second extension. National Operating made a monthly payment of $44,899, but it failed to make full repayment on the loan. In short, it defaulted.

¶ 14. On February 14, 1996, MONY called a default on the Underlying Note and notified National Operating of its intent to exercise its rights under the Assignment, as payee and mortgagee under the Wrap Note. Its February 14 letter also was sent to Bridgeview and directed Bridgeview to make its payments on the Wrap Note to MONY beginning March 1, 1996.

¶ 15. On February 22, 1996, MONY brought a declaratory judgment action, seeking to confirm the operation of the Assignment. It asked for a declaratory judgment, confirming MONY's assumption of the Wrap Note, confirming MONY's interest as primary mortgagee and holder of the Wrap Note and Mortgage, and extinguishing the rights of National Operating as a payee and a mortgagee under the Wrap Note and Mortgage.

¶ 16. MONY attached more than 70 pages of exhibits to its complaint and incorporated them by reference. The exhibits included: (1) the Underlying Note and Security Agreement between National Operating and MONY; (2) the Wrap Note and Purchase Money Mortgage and the accompanying Security Agreement between National Operating and Bridgeview; and (3)

the Loan Modification and Extension Agreement and the accompanying Assignment between National Operating and MONY.

¶ 17. National Operating did not answer the declaratory judgment complaint. Thus, on March 28, 1996, in an order drafted by MONY, the La Crosse County Circuit Court, Michael J. Mulroy, Judge, granted MONY a default judgment. This declaratory judgment by default confirmed the Assignment, confirmed MONY's status as primary mortgagee and holder of the Wrap Note and Mortgage, and extinguished the rights of National Operating as a payee and a mortgagee under the Wrap Note and Mortgage. The declaratory judgment faithfully mirrored the language of MONY's complaint.

¶ 18. After the February 14 letter, confirmed by the March 28 declaratory judgment, MONY took over the Wrap Note and Mortgage. It stepped into National Operating's shoes and began to receive Bridgeview's monthly payments.

¶ 19. Two years later (1998), MONY and Bridgeview negotiated an agreement under which Bridgeview would pay MONY $4 million to satisfy its $5.5 million debt on the Wrap Note, thereby satisfying its debt for $1.5 million less than it owed. MONY would receive a payment from Bridgeview of $4 million, about $1.6 million more than the approximately $2.4 million that remained unpaid by National Operating on the Underlying Note. From this agreement, National Operating would get nothing.

¶ 20. When National Operating learned of the impending transaction, it informed MONY that it wished to tender full payment of its debt—approximately $2.4 million—and to exercise its right to reconveyance of the Wrap Note and Mortgage.

MONY refused the tender, claiming that National Operating's rights had been totally extinguished by the 1996 declaratory judgment.

¶ 21. National Operating reacted in May 1998 by filing a multi-count lawsuit against MONY and Bridgeview, commencing this cause. The complaint alleged that MONY was on the verge of unlawfully disposing of National Operating's collateral in violation of Chapter 409 of the Wisconsin Statutes (Article 9 of the U.C.C.), relating to the rights of debtors in default in secured transactions. It asked for an injunction to prevent disposal of the collateral in a commercially unreasonable manner and a declaratory judgment interpreting the 1993 Assignment as requiring a reconveyance of the Wrap Note to National Operating after MONY was paid in full. National Operating also raised numerous other claims, including breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, intentional interference with a contractual relationship, and civil conspiracy.

¶ 22. MONY and Bridgeview answered, and MONY moved to dismiss National Operating's action on the grounds of res judicata and collateral estoppel (claim preclusion and issue preclusion). MONY contended that in the 1993 Assignment, National Operating had assigned to MONY *all* its rights in the Wrap Note and Mortgage, and that the declaratory judgment had confirmed that National Operating had no remaining rights.

¶ 23. In November 1998 National Operating amended its complaint, taking into account the answers it had received to its original complaint. Then it moved for partial summary judgment on the issue of whether it was entitled to the surplus equity in the

Wrap Note. National Operating claimed that MONY was prohibited from selling the Wrap Note and thereafter retaining surplus equity in the Note. It claimed that MONY was required by the Assignment, after repayment of the original loan, to reconvey the Wrap Note and Mortgage to National Operating. In response, MONY and Bridgeview each filed motions to dismiss National Operating's action.

¶ 24. The circuit court, Judge Gonzalez presiding, granted the motions to dismiss on the grounds of claim preclusion, and denied National Operating's motion for partial summary judgment. The court found that MONY had sought in its declaratory action to confirm its assumption of the Wrap Note and Mortgage pursuant to the Assignment, and to extinguish the rights of National Operating to the Wrap Note and Mortgage. It found that the 1996 judgment declared that National Operating had "no right of reconveyance or right to surplus equity." It concluded that in the prior declaratory action, MONY was "[i]n effect. . .asserting its right in full to the Wrap Note and Mortgage" and that National Operating's claims "would nullify the default judgment entered previously by depriving [MONY] of its property right in the Wrap Note and Mortgage." The court therefore determined that National Operating's claim was barred by claim preclusion.

¶ 25. The court of appeals affirmed, determining that National Operating's claims were precluded by the 1996 declaratory judgment against it. The court stated that MONY's declaratory action had sought to "confirm its assumption of the wrap note and mortgage under the assignment and to extinguish all of National [Operating]'s rights in those instruments." *Nat'l Operating, L.P. v. Mut. Life Ins. Co. of N.Y.*, unpublished

slip op. at 3 (Wis. Ct. App. Dec. 23, 1999). It stated that MONY alleged in its declaratory action that:

> National [Operating]'s rights under the wrap note and mortgage had been extinguished as a result of its default on the underlying note. [MONY] was asserting its rights under the wrap note and mortgage *in full*, claiming, in effect, that National [Operating] had no remaining rights in or under either document. And the judgment expressly declared the parties' rights in all those respects.

*Id.* at 6–7.

¶ 26. The court of appeals acknowledged that MONY's complaint for declaratory judgment did not specifically refer to the "repayment" or "reconveyance" provisions of the Assignment. *Id.* at 7 n.4. It determined, however, that the entire Assignment was incorporated by reference, and thus those provisions "must be considered to have been pleaded." *Id.* The court concluded that National Operating's "repayment" or "reconveyance" rights were "alleged in the complaint and declared in the judgment—and are deemed to have been litigated in that action." *Id.* at 7 n.5.

¶ 27. We granted National Operating's petition to review the decision of the court of appeals.

## II. STANDARD OF REVIEW

¶ 28. The circuit court resolved the case by granting MONY/Bridgeview's motions to dismiss, and denying National Operating's motion for partial summary judgment. We review de novo a circuit court's grant of a motion to dismiss or denial of a motion for partial summary judgment. *Alberte v. Anew Health*

*Care Servs., Inc.*, 2000 WI 7, 232 Wis. 2d 587, ¶ 6, 605 N.W.2d 515; *Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 245, 593 N.W.2d 445 (1999). In reviewing summary judgment rulings, we apply the same methodology as the circuit court, relying upon Wis. Stat. § 802.08(2) (1999–2000).[6] *Thorp v. Town of Lebanon*, 2000 WI 60, ¶ 17 n.5, 235 Wis. 2d 610, 612 N.W.2d 59. The circuit court and the court of appeals both decided this case on the basis of claim preclusion. Whether claim preclusion applies to a given set of facts is also a question of law, which we review de novo. *Lindas v. Cady*, 183 Wis. 2d 547, 552, 515 N.W.2d 458 (1994).

## III. ANALYSIS

A. Article 9 Rights of Debtor in Default

¶ 29. National Operating contends that this case is controlled by the provisions of Article 9 of the Uniform Commercial Code (1972)[7] (Secured Transactions). Hence, we begin our analysis with the Code.

¶ 30. The Uniform Commercial Code is a series of related uniform laws that are intended to "simplify, clarify and modernize the law governing commercial

---

[6] Wisconsin Stat. § 802.08(2) provides in relevant part:

The judgment sought shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

All subsequent references to the Wisconsin Statutes are to the 1999–2000 version.

[7] All subsequent references to Article 9 of the Uniform Commercial Code are to the 1972 version unless otherwise indicated.

transactions." Wis. Stat. § 401.102(2)(a). Another goal of the Code is to "make uniform the law among the various jurisdictions." Wis. Stat. § 401.102(2)(c). We therefore rely on precedent from this and other jurisdictions in interpreting and applying the provisions of the U.C.C.

¶ 31. Wisconsin has adopted each section of the U.C.C. relevant to this case. This includes all of Article 9, which is embodied in Chapter 409 of the Wisconsin Statutes. Chapter 409 does not vary in any material respect from the uniform law. Hence, Article 9 and Chapter 409 are identical for purposes of our analysis and we refer to them interchangeably.[8]

¶ 32. Chapter 409 governs secured transactions in Wisconsin, but it does not specifically define the term "secured transaction." Instead, it provides that Chapter 409 applies to any transaction that is intended to create a security interest. Wis. Stat. § 409.102(1)(a).

¶ 33. Section 409.102 broadly describes the "[p]olicy and subject matter of [the] chapter." It states:

> (1) Except as otherwise provided in s. 409.104 on excluded transactions, this chapter applies:
> (a) To any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper or accounts.
> . . . .

---

[8] Wisconsin Stat. ch. 409 is virtually identical to Article 9 of the U.C.C. Wisconsin Stat. §§ 409.501, 409.502, 409.503, 409.506, and 409.507 are identical to U.C.C. §§ 9–501, 9–502, 9–503, 9–506, and 9–507, respectively. Wisconsin Stat. §§ 409.504 and 409.505 are similar to U.C.C. §§ 9–504 and 9–505, respectively, and are identical insofar as they are relevant to the resolution of this case.

(2) This chapter applies to security interests created by contract including pledge, *assignment*. . . intended as security.

(3) The application of this chapter to a security interest in a secured obligation is not affected by the fact that the obligation is itself secured by a transaction or interest to which this chapter does not apply.

Wis. Stat. § 409.102 (emphasis added).

¶ 34. Official Comment 1 to U.C.C. § 9–102 (Wis. Stat. § 409.102), explains:

[T]he principal test whether a transaction comes under this Article is: is the transaction intended to have effect as security?. . .When it is found that a security interest as defined in Section 1–201(37) was intended, this Article applies regardless of the form of the transaction or the name by which the parties may have christened it.

Unif. Commercial Code § 9–102, 3 U.L.A. 75 (2000), *reprinted in* Wis. Stat. Ann. § 409.102 (West Supp. 2000).[9]

¶ 35. As a general rule, Chapter 409 applies to any transaction that is intended to secure payment or performance of an obligation. Wis. Stat. § 409.102(2); *see also Brown v. Baker*, 688 P.2d 943, 947 (Alaska 1984). Chapter 409 specifically applies to assignments, if they are intended to secure payment or performance of an obligation. Wis. Stat. §§ 409.102(1)(a) and 401.201(37).

---

[9] Section 1–201(37) (Wis. Stat. § 401.201(37)) provides in relevant part that " 'Security interest' means an interest in personal property or fixtures that secures payment or performance of an obligation." U.C.C. § 1–201(37).

¶ 36. A portion of Chapter 409 (Wis. Stat. §§ 409.501 to 409.507) applies to secured transactions in default. Section 409.501 establishes the rights and remedies of both the secured creditor and the debtor in default.[10] It states in relevant part:

Default; procedure when security agreement covers both real and personal property. (1) When a debtor is in default under a security agreement, a secured party has the rights and remedies provided in ss. 409.501 to 409.507 and *except as limited by sub. (3)* those provided in the security agreement.

. . . .

(2) After default, the debtor has the rights and remedies provided in ss. 409.501 to 409.507, those provided in the security agreement and those provided in s. 409.207.

(3) To the extent that they give rights to the debtor and impose duties on the secured party, the rules stated in the sections and subsections referred to in pars. (a) to (e) *may not be waived or varied* except as provided with respect to compulsory disposition of collateral (ss. 409.504(3) and 409.505(1)) and with respect to redemption of collateral (s. 409.506) but the parties may by agreement determine the standards by which the fulfillment of these rights and duties is to be measured if such standards are not manifestly unreasonable.

---

[10] There is no definition of default within the U.C.C.; beyond the requirements of good faith and the limitations of the unconscionability doctrine, default is " 'whatever the security agreement says it is.' " 4 James J. White & Robert S. Summers, *Uniform Commercial Code*, § 34–2, at 386 (4th ed. 1995) (quoting 2 Grant Gilmore, *Security Interests in Personal Property* § 43.3, at 1193 (1965)). There is no dispute that National Operating defaulted on the Underlying Note when it failed to make the required payment to MONY on December 31, 1995.

 (a) Sections 409.502(2) and 409.504(2) insofar as they require accounting for surplus proceeds of collateral;

 (b) Sections 409.504(3) and 409.505(1) which deal with disposition of collateral;

 (c) Section 409.505(2) which deals with acceptance of collateral as discharge of obligation;

 (d) Section 409.506 which deals with redemption of collateral;

 (e) Section 409.507(1) which deals with the secured party's liability for failure to comply with ss. 409.501 to 409.507.

Wis. Stat. § 409.501 (emphasis added).

¶ 37. Certain of the provisions enumerated in Wis. Stat. § 409.501(3)(a)–(e) (U.C.C. § 9–501(3)(a) to (e)), "may not be waived or varied to the extent that those provisions give rights to the debtor and impose duties upon the secured party." 9 William D. Hawkland et al., *Uniform Commercial Code Series* § 9–501:9, at 643 (1997). These provisions include the right to an accounting for surplus equity under §§ 409.502(2) and 409.504(2), and the right to disposition of collateral in a commercially reasonable manner under § 409.504(3). U.C.C. § 9–501(3)(a)-(b). The right to redeem collateral under § 409.506 may be waived, but only at a specific time in a specific manner. 9 Hawkland, *supra,* § 9–501:9, at 643.

¶ 38. These rights should be examined in turn. First, a debtor in default has a right to surplus equity resulting from the secured creditor's disposal of collateral. Section 409.502(2) governs the secured creditor's rights to collect collateral in the event of the debtor's default. Section 409.503 authorizes the secured creditor to take possession of the collateral upon default. Section 409.504 then describes the secured party's right to dispose of the collateral after default.

¶ 39. Section 409.504(2) provides: "If the security interest secures an indebtedness, the secured party *must account to the debtor for any surplus,* and, unless otherwise agreed, the debtor is liable for any deficiency." Wis. Stat. § 409.504(2) (emphasis added).

¶ 40. Official Comment 3 to U.C.C. § 9–504 (Wis. Stat. § 409.504) explains: "*In any security transaction the debtor . . . is entitled to any surplus which results from realization on the collateral;* the debtor will also, unless otherwise agreed, be liable for any deficiency. Subsection (2) so provides." Unif. Commercial Code § 9–504, 3B U.L.A. 130 (2000) (emphasis added), *reprinted in* Wis. Stat. Ann. § 409.504 (West 2000).

¶ 41. The secured creditor may choose the manner in which it disposes of collateral, "subject to the limitation that the disposition must be commercially reasonable. Thereafter, the creditor must account for a surplus and may sue for a deficiency." *IFG Leasing Co. v. Gordon,* 776 P.2d 607, 612 (Utah 1989).

█

¶ 42. The secured creditor is not authorized to retain surplus equity. The debtor in default has the right to surplus equity, and it may not waive the right. *Major's Furniture Mart, Inc. v. Castle Credit Corp.,* 602 F.2d 538, 542 (3d Cir. 1979); *Bill Fitts Auto Sales, Inc. v. Daniels,* 922 S.W.2d 718, 722 (Ark. 1996).

█

¶ 43. Second, a debtor in default has the right to require a secured creditor to dispose of collateral in a commercially reasonable manner. This right may not be waived or varied. Wis. Stat. §§ 409.501(3), 409.502(2), and 409.504(3); *see also Tropical Jewelers, Inc. v. Nationsbank, N.A. (South),* 781 So. 2d 392, 394 (Fla. Dist. Ct. App. 2000). "[E]very aspect of the disposition including the method, manner, time, place and

terms must be commercially reasonable." Wis. Stat. § 409.504(3). "[W]hen a transaction is governed by Article 9, a guarantor's 'waiver of the right to the commercially reasonable disposition of collateral as set forth in U.C.C. § 9–504 is null and void.'" *Bank of China v. Chan*, 937 F.2d 780, 785 (2d Cir. 1991) (quoting *Marine Midland Bank v. CMR Indus.*, 559 N.Y.S.2d 892, 893 (N.Y. App. Div. 1990)).

¶ 44. Third, a debtor in default has the right to redeem the collateral under Wis. Stat. § 409.506. Section 409.506 provides:

> At any time before the secured party has disposed of collateral or entered into a contract for its disposition under s. 409.504 or before the obligation has been discharged under s. 409.505(2) the debtor or any other secured party *may unless otherwise agreed in writing after default redeem the collateral* by tendering fulfillment of all obligations secured by the collateral as well as the expenses reasonably incurred by the secured party.[11]

Wis. Stat. § 409.506 (emphasis added).

¶ 45. A debtor's right of redemption "exists until the secured party has disposed of or contracted to dispose of the collateral." *Emmons v. LeMaster, Inc.*, 10 P.3d 33, 36 (Kan. Ct. App. 2000).

---

[11] Under Wis. Stat. § 409.505(2), a secured creditor may, after default, propose to retain the collateral in satisfaction of the debt secured by the collateral. The creditor must inform the debtor in writing if it proposes to retain the collateral, unless the debtor has signed after default a statement renouncing its right to notice. After receiving notice, the debtor has 21 days to object to the retention of the collateral. If the debtor so objects, the creditor must dispose of the collateral pursuant to § 409.504. Wis. Stat. § 409.505(2).

¶ 46. A debtor may waive or vary its right to redeem collateral, *but only in writing, after default.* Before default, the debtor may not waive its right to redeem the collateral, even in writing. *Kellos v. Parker-Sharpe, Inc.,* 263 S.E.2d 138, 140 (Ga. 1980). Thus, a debtor may not waive its right to redeem its collateral as part of a security agreement. *Indianapolis Morris Plan Corp. v. Karlen,* 268 N.E.2d 632, 633–34 (N.Y. Ct. App. 1971). "[T]he debtor may not before default, as in the security agreement, modify or vary his or her right of redemption under section 9–506 since it is one of those rights which may not be modified or varied under subsection 9–501(3)." 9 Hawkland, *supra,* § 9–506:5, at 795.

¶ 47. In summary, a secured transaction debtor in default may not waive or vary its right to surplus equity upon the disposition of the collateral, or its right to contest the commercial reasonableness of the disposition of its collateral. It may waive or vary its right to redeem the collateral by tendering fulfillment of its obligation, *but only in writing, after default.* The purpose of these restrictions on the ability to waive or vary the debtor's rights in default is explained in Official Comment 4 to U.C.C. § 9–501, which states in part:

> *In the area of rights after default our legal system has traditionally looked with suspicion on agreements designed to cut down the debtor's rights and free the secured party of his duties:* no mortgage clause has ever been allowed to clog the equity of redemption. *The default situation offers great scope for overreaching;* the suspicious attitude of the courts has been grounded in common sense.
>
> Subsection (3) of this section [U.C.C § 9–501, Wis. Stat. § 409.501] contains a codification of this

> longstanding and deeply rooted attitude: the specified rights of the debtor and duties of the secured party may not be waived or varied except as stated.

Unif. Commercial Code § 9–501, 3B U.L.A. 11 (2000) (emphasis added), *reprinted in* Wis. Stat. Ann. § 409.501 (West 2000).

¶ 48. The purpose of Article 9 protections for debtors is further explained in *Walker v. Grant County Savings and Loan Ass'n*, 803 S.W.2d 913, 916 (Ark. 1991): "One clear policy reason underlying Article 9 default provisions is the protection of post default debtors from the potential of overbearing tactics and intimidation by secured parties."

¶ 49. We now apply the principles of Chapter 409 to the facts of this case.

B. Rights of the Debtor in Default in this Case

¶ 50. Two of the transactions central to this case—the loan from MONY to National Operating in exchange for the Underlying Note and Mortgage, and the sale of Bridgeview Plaza from National Operating to Bridgeview in exchange for the Wrap Note and Mortgage—are clearly labeled as security agreements. The Underlying Note states that it is a "Mortgage Note" secured by a "Mortgage and Security Agreement." The Mortgage and Security Agreement specifically states that the loan secured by the Underlying Note is a " 'security agreement'. . .subject to Article 9 of the Uniform Commercial Code."

¶ 51. Likewise, the Wrap Note is an "all-inclusive purchase money promissory note and is secured by an all-inclusive purchase money Mortgage and Security

Agreement. . .between the. . .mortgagor, and. . .the mortgagee." The Wrap Note explicitly states that it "creates a security interest." Both the Underlying Note and the Wrap Note were therefore clearly intended as security agreements, and both are subject to Chapter 409.

¶ 52. The 1996 Assignment was also intended as a security agreement. In its first amended complaint, National Operating alleged that "[a]s additional security for the now extended Underlying Note, National Operating made a collateral assignment of the Wrap Note to MONY." In its answer, MONY admitted National Operating's allegation.

¶ 53. That the Assignment was intended as security is also established in the deposition of James J. Postweiler, the former real estate vice president of MONY, who negotiated the Assignment for MONY.[12] Postweiler acknowledged that the language in the Assignment regarding MONY taking the assignment of rights and remedies under the Wrap Note in the event of default was inserted to provide MONY with additional security, stating: "the concept of receiving the assignment as additional security in the event of default. . .was represented in the final agreement." He also stated: "My understanding with regard to the assignment is very clearly that that assignment was there as additional security during the extension period or after in any event of default."

¶ 54. National Operating agreed to the Assignment, pledging the Wrap Note and Mortgage as

---

[12] At some point after MONY and National Operating agreed to the Assignment, Postweiler left his employment at MONY. At the time of his October 8, 1998 deposition, Postweiler represented Bridgeview, "working with Bridgeview Plaza in their efforts to refinance the property."

collateral, to give MONY additional security for the Underlying Note and the Loan Extension. Consequently, all the pertinent transactions in this case were secured transactions to which Chapter 409 of the statutes applies. We must look to Chapter 409 to ascertain the rights and remedies that the parties possessed as creditors and debtors in the event of default.

¶ 55. In 1993, during the 15th year of its agreement with National Operating, MONY called its loan. National Operating was unable to make full repayment. This is when the Loan Modification and Extension Agreement and the Assignment were negotiated.

¶ 56. If we assume that National Operating's failure to pay off the loan in 1993 was a default, National Operating could have executed a written waiver of its right to redeem its collateral by full payment of its loan obligation. Wis. Stat. § 409.506. However, the notion that the 1993 Assignment was a written waiver of the statutory right of redemption is inconsistent with the paragraph in the Assignment that reaffirmed National Operating's right to reconveyance of the Wrap Note and Mortgage upon full payment of its obligation.[13] Inasmuch as the Assignment was a new security agreement, it is doubtful that it could have contained a written waiver. *See* 9 Hawkland, *supra*, § 9–506:5, at 796.

¶ 57. In any event, National Operating could not waive its statutory right to commercially reasonable disposal of the collateral or its statutory right to sur-

---

[13] The last substantive paragraph of the Assignment reads: "Upon payment of the Note and any amounts due under the Mortgage, Assignee shall convey the Wrap Note and Mortgage to Assignor."

plus equity. It could not waive these two rights before default or after default. It could not waive these rights under any circumstances.

¶ 58. Furthermore, there is some question whether National Operating should be viewed as a debtor in default in 1993 inasmuch as it renegotiated an extension of its loan and paid heavily to do so.

¶ 59. After December 31, 1995, the situation clearly changed. National Operating became a debtor in default because of its failure to pay off the full loan and its failure to secure an additional extension.

¶ 60. After this default, MONY was entitled to exercise its rights as a secured creditor under Chapter 409 and its rights under the negotiated Assignment. However, any rights it secured in the negotiated Assignment had to be consistent with rights it was authorized to obtain through negotiation under Chapter 409.

¶ 61. After default, National Operating was entitled to its rights as a debtor in default. Chapter 409 gave this debtor two rights—the right to surplus equity and the right to commercially reasonable disposal of the collateral. Wis. Stat. §§ 409.502, 409.504. The debtor could not waive these two rights. Chapter 409 gave the debtor another right—the right to redemption of the collateral upon full payment of the obligation, provided the collateral was still available. Wis. Stat. § 409.506. This right could have been waived in writing *after default*, but there is no written waiver of this right in any document after the 1995 default.

¶ 62. To sum up, looking solely at Chapter 409, we conclude that National Operating retained all the debtor's rights enumerated in the statute.

## C. Declaratory Judgment and Claim Preclusion

¶ 63. MONY presents a dramatically different perspective of this case. It argues that its 1996 declaratory judgment, based upon an alternative interpretation of the facts, totally extinguished National Operating's rights. It asserts that the declaratory judgment thus precluded any claims founded in Article 9.[14]

¶ 64. MONY contends that in 1993, National Operating, after defaulting, convinced MONY to execute the Loan Modification and Extension Agreement, which extended the maturity date on the loan until the end of 1995. MONY argues in its brief: "In addition, and as a means to provide MONY with additional security for the extension, National Operating assigned to MONY 'all of its rights, title and interest in those certain rights and remedies granted in the Wrap Note and Mortgage by Bridgeview.' "

¶ 65. When National Operating defaulted at the end of 1995, MONY brought a declaratory judgment action seeking to confirm the operation of the Assignment "in light of National Operating's second default on the Underlying Note." According to MONY's brief,

> MONY prayed for a declaration confirming its full and unconditional ownership of the Wrap Note and Mortgage and "extinguishing" National Operating's remaining rights in these instruments.
>
> . . . .

---

[14] In their briefs, neither MONY nor Bridgeview address the applicability of the U.C.C. to the issues in this case, despite National Operating having argued extensively to the circuit court, the court of appeals, and this court that the transactions in this case were secured transactions, governed by the U.C.C.

. . .On March 28, 1996. . .the Court entered a declaratory judgment consistent with MONY's request.

. . . .

In response to National Operating's [1998] Complaint, MONY moved to dismiss the action on [claim] preclusion grounds. MONY argued that the 1996 Declaratory Judgment, which confirmed the complete assignment of the Wrap Note and Mortgage to MONY, as well as the resulting extinguishment of National Operating's rights in those instruments, barred National Operating's current efforts.

¶ 66. This, in essence, was the view adopted by the circuit court and the court of appeals. MONY's interpretation of the 1996 declaratory judgment requires us to address claim preclusion under declaratory judgments.

1. Claim Preclusion

¶ 67. The circuit court and the court of appeals both determined that National Operating's claims were barred by claim preclusion. Under the doctrine of claim preclusion, formerly known as res judicata, a final judgment is conclusive in all subsequent actions between the same parties as to any claim or cause of action that was litigated or *could have been litigated* in the first action. *Sopha v. Owens-Corning Fiberglas Corp.*, 230 Wis. 2d 212, 233, 601 N.W.2d 627 (1999).

¶ 68. In *Barbian v. Lindner Bros. Trucking Co.*, 106 Wis. 2d 291, 296–97, 316 N.W.2d 371 (1982), this court examined whether the same claim preclusion rule applies to declaratory judgments. We concluded that it does not, stating: "[A] declaratory judgment is

only binding as to matters which were actually decided therein and is not binding to matters which 'might have been litigated' in the proceeding." *Barbian*, 106 Wis. 2d at 297.

¶ 69. The declaratory judgment here was a default judgment. Subsequent actions may be precluded by a prior default judgment. *A.B.C.G. Enters. v. First Bank Southeast*, 184 Wis. 2d 465, 481, 515 N.W.2d 904 (1994). However, in default judgments, relief "is limited to that which is demanded in the plaintiff's complaint." *Klaus v. Vander Heyden*, 106 Wis. 2d 353, 359, 316 N.W.2d 664 (1982). "The judgment does not extend to issues which were not raised in the pleadings." *Id.* at 360.

¶ 70. For claim preclusion to apply to an action, "the following factors must be present: (1) an identity between the parties or their privies in the prior and present suits; (2) an identity between the causes of action in the two suits; and (3) a final judgment on the merits in a court of competent jurisdiction." *Northern States Power Co. v. Bugher*, 189 Wis. 2d 541, 551, 525 N.W.2d 723 (1995).

¶ 71. The parties agree that the "identity between the parties" and the "final judgment" requirements are met in this case. MONY, National Operating, and Bridgeview were the named parties in the 1996 declaratory action, which was decided by a final declaratory judgment. The question for the court is whether an identity exists between the claims National Operating raised in its current action, and the causes of action pleaded, actually litigated, and decided in the 1996 declaratory judgment.

869

## 2. Assignment, Complaint, and Declaratory Judgment

¶ 72. To determine what was actually pleaded and litigated in the declaratory judgment, we must examine the Assignment, MONY's declaratory complaint, and the resulting declaratory judgment.

¶ 73. We begin with the Assignment. The Assignment from National Operating to MONY states in relevant part:

> NOW, THEREFORE, [National Operating] does hereby assign to [MONY] all of its right, title and interest in those certain rights and remedies granted in the Wrap Note and Mortgage by Bridgeview, to [National Operating].
>
> At any time after default, under the Wrap Note and Mortgage, [MONY] may exercise said rights and remedies at such time and instance [National Operating] would be able to exercise those rights and remedies, upon notice to and without recourse from [National Operating].
>
> Upon payment of the [underlying] note and any amounts due under the [underlying] mortgage, [MONY] shall convey the Wrap Note and Mortgage to [National Operating].

¶ 74. The heart of the Assignment includes three distinct paragraphs. Because the effectiveness of the first paragraph depends entirely upon the "default" referenced in the second paragraph, the Assignment cannot be viewed as an absolute assignment in which there is an immediate, absolute transfer of rights. An example of this kind of assignment, the 1978 assignment of the Underlying Note from the Trustees of MONY Mortgage Investors to MONY, is described above. *See supra* ¶ 7 note 2. It must instead be viewed as a collateral assignment, in which the collateral

serves as security for a loan,[15] and as a conditional assignment in which the condition precedent is default on the loan..

¶ 75. The declaratory complaint was filed on February 22, 1996, eight days after MONY notified National Operating that it would exercise its rights under the Assignment. In the complaint, MONY meticulously details the relationships and transactions among the parties and attaches and incorporates by reference about 70 pages of exhibits, including the Underlying Note and Security Agreement, the Wrap Note and Purchase Money Mortgage along with the Security Agreement, and the Loan Modification and Extension Agreement along with the Assignment.

¶ 76. Paragraph 11 of the complaint reads in part: "In consideration of the Loan Modification and Extension Agreement. . .National Operating. . .assigned its rights under the Note and Mortgage between it and. . .Bridgeview Plaza Partnership. . .to the Plaintiff pursuant to an Assignment dated October 18, 1993. . . .A copy of this Assignment is attached and incorporated herein by reference."

¶ 77. Paragraph 12 of the complaint states: "Pursuant to the terms of the Assignment, notice was given

---

[15] National Operating's legal counsel, Cary L. Newburger, stated in an affidavit that he suggested inserting the reconveyancing paragraph into the Assignment "to clarify that National Operating was assigning the Wrap Note to MONY as additional security for National Operating's obligation to MONY." Newburger further stated that "[t]his was always intended to be a standard assignment for security purposes: National Operating assigned the Wrap Note to MONY as additional security for its debt to MONY, and upon repayment of National Operating's debt to MONY, the Wrap Note was to be returned to National Operating."

■■■■■■■
■■■■■■■

to [National Operating] that [MONY] will exercise the rights and remedies of [National Operating] under the [Wrap] Note and Mortgage described in the Assignment."

¶ 78. After alleging the facts, MONY specifically sought relief in the form of:

> a Declaratory Judgment of this Court confirming its assumption of the Notes between the Defendant, National Operating, L.P., and the Defendant, Bridgeview Plaza Partnership; extinguishing the rights of the Defendant, National Operating, L.P., as a mortgagee under said Mortgage; extinguishing the rights of the Defendant, National Operating, L.P., as payee under the Note; and confirming the Plaintiff's interest as primary mortgagee and holder of the Note and Mortgage declared herein.

¶ 79. When National Operating did not answer the complaint, Judge Mulroy granted MONY a default judgment on March 28, 1996: (1) "confirming the assignment and assumption of the Notes between. . .National Operating,. . .and Bridgeview Plaza Partnership, in LaSalle National Bank, as Indenture Trustee";[16] (2) "extinguishing the rights of. . .National Operating,. . .as a mortgagee under said Mortgage"; (3) "extinguishing the rights of. . .National Operating. . .as payee under the Note"; and (4) "confirming LaSalle National Bank as the primary mortgagee and holder of the Note and Mortgage."

¶ 80. Taking a close look at the complaint, there is no reference to the contingency enumerated in the Assignment of the right to reconveyance of the Wrap

---

[16] Both MONY and National Operating acknowledge that MONY had transferred its interest in the Wrap Note to LaSalle National Bank, which later transferred it back to MONY.

Note and Mortgage upon payment of the Underlying Note. There is no reference in the complaint to the Uniform Commercial Code. There is no claim that National Operating had waived a statutory right. There is only a demand to extinguish "certain" of National Operating's rights.

¶ 81. The declaratory judgment closely follows the complaint. It does not acknowledge and then confirm, in specific terms, a waiver of National Operating's right to redeem collateral upon payment of the loan, nor does it make any specific reference to extinguishing rights under Article 9 or Chapter 409.

¶ 82. The declaratory judgment grants only what MONY asked in its complaint; it could have granted nothing more. Wis. Stat. § 806.01(1)(c);[17] *Klaus*, 106 Wis. 2d at 359.

¶ 83. The issue then is whether this 1996 declaratory judgment precludes the present claims by National Operating, irrespective of its rights under Chapter 409, because the substance of these claims was aptly pleaded by MONY and fully determined by the circuit court.

¶ 84. Once again, the rule on claim preclusion in a declaratory judgment action is different from the rule on claim preclusion in typical litigation: A declaratory judgment is binding only as to matters which were actually decided in the action, not to matters which

---

[17] Wisconsin Stat. § 806.01(1)(c) provides in relevant part:

> Every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded the relief in the pleadings. If there be no answer the relief granted to the plaintiff shall not exceed that demanded in the complaint.

might have been litigated in the proceeding but were not. *Barbian,* 106 Wis. 2d at 297.

■■

¶ 85. Put bluntly, did MONY plead and did Judge Mulroy decide that National Operating, in the 1993 Assignment, bargained away its right to all surplus equity in the collateral and its right to commercially reasonable disposition of collateral, notwithstanding the protective provisions of Chapter 409? We see no evidence that MONY articulated such a far-reaching claim in its complaint and no evidence that Judge Mulroy bought into such a claim. To accept that proposition would require us to believe that Judge Mulroy consciously disregarded the statutory law. We decline to do so.

¶ 86. Whether National Operating waived its right to redeem collateral in the 1993 Assignment is a closer question. Nevertheless, for MONY to prevail, it must argue that its declaratory complaint implicitly alleged that National Operating defaulted in 1993; that after this default, National Operating consciously waived its right to redeem collateral within the written Assignment; that Judge Mulroy understood this implication of the complaint; that he made a determination that the "default" referred to in Wis. Stat. § 409.506 was the 1993 default, not the 1995 default; and that he granted judgment to confirm MONY's theory.

¶ 87. Such an argument is unreasonable for several reasons. Contrary to MONY's assertions, the 1993 Assignment does not on its face assign all right, title and interest in the Wrap Note and Mortgage to MONY. Instead, National Operating assigns "all of its right, title and interest *in those certain rights and remedies granted in the Wrap Note and Mortgage*" (emphasis added). We perceive significance in this limiting lan-

guage. Obviously, none of the debtor's rights in Chapter 409 is "granted in the Wrap Note and Mortgage." Moreover, the right to reconveyance in the Assignment—a right that parallels the right of redemption in Wis. Stat. § 409.506—is simply different from any right of redemption granted in the Wrap Note and Mortgage. After all, National Operating possessed the Wrap Note and Mortgage before default. Any right to redemption "granted in the Wrap Note and Mortgage" would have been Bridgeview's right, not National Operating's right, and would have come into play if and when Bridgeview paid off its obligation to National Operating. The surrender of some right to redemption "granted in the Wrap Note and Mortgage" is not the same as the surrender of a right to reconveyance granted in the Assignment.

¶ 88. MONY contends that the second and third relevant paragraphs of the Assignment are mutually exclusive and that the third paragraph of the Assignment on reconveyance applies only if National Operating paid the Underlying Note in full, without defaulting. These interpretations are not self-evident from the text, and MONY's interpretation of the third paragraph does not make sense. Why would National Operating insist on including a paragraph in the Assignment that substantively reduced its statutory right of redemption?

¶ 89. When a debtor in default waives its statutory right to redeem collateral by paying off the obligations secured by the collateral, the waiver must be agreed to in writing by the parties. Wis. Stat. § 409.506. A clear, explicit written waiver records the agreement of the parties. Unclear, ambiguous language that is subject to after-the-fact interpretation is

inconsistent with the debtor protections contained in Article 9 of the Code.[18]

¶ 90. Turning to the complaint, MONY asserts that the complaint alleged and sought a judgment declaring the extinguishment of *all* National Operating's rights in the Wrap Note and Mortgage. It claims that even if it did not specifically allege the extinguishment of all National Operating's rights, it effectively pleaded every provision of the Underlying Note, Wrap Note, and Assignment by incorporating each of those documents by reference. It cites Wis. Stat. § 802.04(3) for the proposition that "a copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." It therefore asserts that inasmuch as these documents were attached to the complaint and incorporated by reference, they were aptly pleaded, citing to *A.B.C.G. Enters.*, 184 Wis. 2d at 481.

¶ 91. We disagree. MONY did not aptly plead all provisions of the Underlying Note, Wrap Note, and Assignment, as well as all the other documents, simply by attaching them to the complaint and incorporating them by reference.

■■■

¶ 92. MONY's complaint consisted of six pages. Its request for relief was contained in a single tightly-written paragraph. National Operating could have read the complaint without discerning the interpretation now being advanced by MONY and without suspecting that the 70 pages of exhibits were more than documentation.

---

[18] Under appropriate circumstances, a debtor in default ought to be willing to waive its redemption right, knowing that a secured creditor may thus be motivated not to rush to dispose of the collateral.

¶ 93. Wisconsin Stat. § 802.04(3) must not be interpreted to mean that in a declaratory judgment action, a party aptly pleads every provision of every document that it incorporates by reference, for claim preclusion purposes. In a declaratory judgment action, claim preclusion is limited to those matters that are actually litigated. *Barbian*, 106 Wis. 2d at 297. To be actually litigated in this context, a matter must be pled with sufficient clarity to give notice to the opposing party and the court of what claims are at stake so that they will understand the claims that will be barred in future litigation.

¶ 94. Here there was a default judgment. By failing to answer the complaint, National Operating was conceding every claim actually pleaded. But National Operating was not given fair notice in the complaint that MONY sought to extinguish *all* its rights, as opposed to the "certain" rights granted it as a payee or mortgagee under two specific documents. This court will not countenance a procedure that permits a party to unconsciously surrender what it could not consciously waive, or to lose in ambiguity what it could only waive in an explicit writing.

¶ 95. The declaratory judgment—a document drafted by MONY—granted precisely the relief sought in MONY's complaint, nothing more. The broad scope attributed to the declaratory judgment by MONY simply is not present in the legal document.

¶ 96. By its plain language, the declaratory judgment confirmed the Assignment and MONY's assumption of the Wrap Note, confirmed MONY's interest as primary mortgagee and holder of the Wrap Note and Mortgage, and extinguished the rights of National *as payee and mortgagee*. It did not declare

that National Operating had given up all its rights in or to the Wrap Note. It did not declare that National Operating agreed in the Assignment to give up its rights under Chapter 409. It did not by its plain language extinguish National Operating's right of reconveyance of collateral were MONY paid in full for obligations owed it on the Underlying Note. Consequently, MONY is still required to reconvey the collateral to National Operating once National Operating satisfies all its obligations, if the collateral is still available. Wis. Stat. § 409.506.

¶ 97. The declaratory judgment enforced the terms of the Assignment. It thereby eliminated any doubt that Bridgeview should make monthly interest payments on the Wrap Note to the assignee. It enabled MONY to dispose of the collateral in a commercially reasonable manner. Thus, MONY was authorized to sell the collateral to Bridgeview if it did so in a commercially reasonable manner.

■

¶ 98. Conversely, MONY was not authorized to sell the collateral without notice to National Operating. Wis. Stat. § 409.504(3). It was not authorized to dispose of the property in a manner that was not commercially reasonable. Wis. Stat. §§ 409.501(3), 409.502(2), and 409.504(3). And it was not authorized to keep surplus equity for itself. Wis. Stat. § 409.504(2).

¶ 99. The Uniform Commercial Code is one of the preeminent achievements of American law. It is constantly under review so that it can address changing practices in the world of commerce.[19] Our role as a

---

[19] In 1998, a revised Article 9 was approved by the National Conference of Commissioners on Uniform State Laws and the American Law Institute. Unif. Commercial Code § 9–101, cmt. 2, (amended 2000), 3 U.L.A. 21 (2000). The revised Article 9,

court is not to question the effect of Code provisions in a particular case. Our role is to apply the law.

## D. Disposition of Motions in this Case

¶ 100. In its first amended complaint, National Operating raised 11 claims. The circuit court dismissed all these claims, finding that:

> All of [National Operating's] claims in the present action, Unlawful Disposition of Collateral, Anticipatory Breach of Contract, Breach of Implied Covenant of Good Faith and Fair Dealing, Unjust Enrichment, Intentional Interference With Contractual Relationship, Civil Conspiracy, and Accounting, if successfully litigated, would nullify the default judgment previously entered by depriving [MONY] of its property right in the Wrap Note and Mortgage. Therefore [National Operating]'s claims are barred by the doctrine of claim preclusion.

¶ 101. A moving party is entitled to summary judgment when no genuine issue of material fact exists and it is entitled to judgment as a matter of law. *Nierengarten v. Lutheran Soc. Servs.*, 219 Wis. 2d 686, 695, 580 N.W.2d 320 (1998). We have determined that

which was made effective July 1, 2001, "reflects a substantial reorganization of former Article 9 and renumbering of most sections." Unif. Commercial Code § 9–101, cmt. 3, (amended 2000), 3 U.L.A. 21 (2000). Wisconsin amended Wis. Stat. Chapter 409, adopting revised Article 9, on June 22, 2001, effective July 1, 2001. 2001 Wis. Act 10. While this opinion would have referred to different sections of the statutes had the amended Chapter 409 been in effect for this case, the changes to Chapter 409 affirm our reasoning and would not have altered the result of this case.

879

National Operating possesses certain rights in and to the Wrap Note and Mortgage that were not litigated in the declaratory judgment action nor declared in the resulting judgment. We therefore conclude that National Operating's claims are not barred by claim preclusion. They should not have been dismissed on that basis. We hereby remand this case to the circuit court with instructions to reinstate National Operating's claims.

¶ 102. In its motion for partial summary judgment, National Operating sought only a declaration "that it is entitled to the surplus equity in the security (Wrap Note) it assigned to Mutual Life Insurance Company of New York (MONY) as collateral for National Operating's obligation to MONY." The circuit court denied the motion. It is undisputed that National Operating assigned the Wrap Note to MONY as security for its obligation on the Underlying Note. We conclude that the assignment of the Wrap Note and Mortgage was a secured transaction governed by Chapter 409. Under Chapter 409, a debtor in default in a secured transaction has a non-waivable and non-variable right to surplus equity in the collateral, as provided in the statutes. There are therefore no remaining issues of material fact or questions of law relative to National Operating's motion. Accordingly, we remand to the circuit court with instructions to grant National Operating's motion for partial summary judgment, declaring that National Operating is entitled to surplus equity after disposition of the Wrap Note by MONY.

## IV. CONCLUSION

¶ 103. We hold that under the facts of this case, National Operating is a debtor in default in a secured transaction pursuant to Chapter 409 of the Wisconsin Statutes (Article 9 of the U.C.C.). It therefore possesses and retains certain non-waivable and non-variable rights, including the right to contest the reasonableness of any disposition of the collateral, and the right to receive any surplus equity after disposition of collateral by MONY. It also has a right to redeem the collateral if it satisfies certain obligations, provided the collateral is still available. These rights were not "bargained away" by National Operating, litigated in MONY's declaratory judgment action, nor declared in the declaratory judgment. Since these rights are the basis of National Operating's current claim, we determine that the circuit court improperly granted the motions to dismiss filed by MONY and Bridgeview. We further determine that National Operating is entitled as a matter of law to partial summary judgment on its claim that it has a right to surplus equity after disposition of the Wrap Note.

*By the Court.*—The decision of the court of appeals is reversed and the cause is remanded.

¶ 104. N. PATRICK CROOKS, J. *(dissenting).* I cannot join the majority opinion because Chapter 409 of the Wisconsin Statutes does not control the result of this case. The majority opinion is putting the cart before the horse, beginning its analysis with Chapter 409, before addressing the doctrine of claim preclusion. In my view, the court of appeals correctly held that National Operating is precluded from bringing its claims against MONY and Bridgeview. The March 28,

1996, default declaratory judgment extinguished any rights guaranteed to National Operating under Chapter 409. As a result, National Operating is barred under the doctrine of claim preclusion from asserting its rights under Chapter 409 in the present case.

¶ 105. I have no substantial dispute with the majority opinion's discussion of the doctrine of claim preclusion, however, I strongly disagree with the majority's application of that doctrine to the facts of this case. I agree with the majority opinion that there is common identity among the parties. Majority op. at ¶ 71. In the declaratory judgment action, MONY, National Operating, and Bridgeview were the named parties. In the present case, MONY, National Operating, and Bridgeview are the named parties. I also agree with the majority that the previous action is a final judgment, on the merits, in a court of competent jurisdiction. *Id.* For the purposes of a claim preclusion analysis, a default judgment is a final judgment. *See A.B.C.G. Enters., Inc. v. First Bank Southeast*, 184 Wis. 2d 465, 481, 515 N.W.2d 904 (1994). In MONY's declaratory judgment action, the circuit court granted a default judgment against National Operating. Pl.-Appellant-Pet'r App. at 136. The declaratory judgment in favor of MONY is a final judgment for claim preclusion purposes.

¶ 106. Where I disagree with the majority opinion is the conclusion that the substance of the present claims was not aptly pleaded by MONY and was, therefore, not fully decided by the circuit court. The analysis concerns what was actually decided in the declaratory judgment action and what material issuable facts were well pleaded in MONY's complaint. *See Barbian v. Lindner Bros. Trucking Co.*, 106 Wis. 2d 291, 297, 316

N.W.2d 371 (1982); *Klaus v. Vander Heyden*, 106 Wis. 2d 353, 359–60, 316 N.W.2d 664 (1982).

¶ 107. I begin the analysis, therefore, by examining what was well pleaded in MONY's complaint for declaratory judgment. The majority opinion acknowledges the comprehensive nature of the information contained within MONY's complaint:

> MONY meticulously details the relationships and transactions among the parties and attaches and incorporates by reference about 70 pages of exhibits, including the Underlying Note and Security Agreement, the Wrap Note and Purchase Money Mortgage along with the Security Agreement, and the Loan Modification and Extension Agreement along with the Assignment.

Majority op. at ¶ 75. In its complaint MONY asked that:

> [t]he Plaintiff [MONY] seeks a Declaratory Judgment of this Court *confirming its assumption of the Notes* between the Defendant, National Operating, L.P., and the Defendant, Bridgeview Plaza Partnership; *extinguishing the rights of the Defendant, National Operating, L.P., as a mortgagee under said mortgage; extinguishing the rights of the Defendant, National Operating, L.P., as payee under the Note*; and confirming the Plaintiff's interest as primary mortgagee and holder of the Note and Mortgage declared herein.

Compl. of MONY at 5 (emphasis added). The Assignment, which was attached to MONY's complaint for declaratory judgment, stated, in part:

> NOW, THEREFORE, Assignor does hereby assign to Assignee *all of its right, title and interest* in those certain rights and remedies granted in the

Wrap Note and Mortgage by Bridgeview, to Assignor.

*At any time after default*, under the Wrap Note and Mortgage, *Assignee may exercise said rights* and remedies at such time and instance Assignor would be able to exercise those rights and remedies, upon notice to and *without recourse* from Assignor.

Pl.-Appellant-Pet'r App. at 125–26 (emphasis added).

¶ 108. The broad language of MONY's complaint for declaratory judgment, and the extensive exhibits attached thereto, establish that MONY was seeking *all* rights in the Wrap Note and Mortgage. In its complaint, MONY asked the circuit court to confirm its assumption of the Wrap Note and Mortgage between National Operating and Bridgeview. Nowhere in the complaint is there a statement that this assumption is subject to National Operating's right of reconveyance or right to any surplus equity. In addition, MONY asked the circuit court to extinguish the rights of National Operating to the Wrap Note and Mortgage. In its complaint, MONY did not ask that all of National Operating's rights would be extinguished, except for the right to reconveyance and the right to any surplus equity.

¶ 109. MONY supplemented its requests in the complaint with all of the details and documents regarding the Wrap Note and Mortgage, including the Assignment. It stated that all of the attached documents were incorporated by reference. The majority opinion concludes that MONY did not aptly plead all of the provisions of the attached documents, including the Assignment, for claim preclusion purposes. Majority op. at ¶¶ 91–93. The problem is that the majority opinion provides no legal support for this conclusion. Perhaps, this is because this conclusion is contrary to

well-established law. Any document attached to a pleading, if adopted by reference, becomes part of that pleading for all purposes. Wis. Stat. § 802.04(3); *See also Sedgwick v. Blanchard*, 164 Wis. 421, 423, 160 N.W. 267 (1916) (holding that a contract attached to a complaint is part of that complaint for the purpose of testing the sufficiency of the complaint); *Continental Bank & Trust Co. v. Akwa*, 58 Wis. 2d 376, 387, n.11, 206 N.W.2d 174 (1973) (holding that papers attached to a complaint and incorporated by reference are considered a part of the complaint).

¶ 110. Important among the documents attached to MONY's complaint is the Assignment between MONY and National Operating. In paragraph 1 of the Agreement section of the Assignment, National Operating specifically gave MONY all rights, title, and interest in the Wrap Note and Mortgage. In paragraph 2 of the Agreement section of the Assignment, National Operating permitted MONY, in the event of a default by National Operating on the Underlying Note and Mortgage, to exercise all the rights to the Wrap Note and Mortgage, leaving National Operating without recourse. The only reservation of rights in the Assignment is located in paragraph 3 of the Agreement Section, where MONY promised to reconvey the Wrap Note and Mortgage *if* National Operating paid the Underlying Note and Mortgage to MONY. Paragraphs 2 and 3 are mutually exclusive alternatives. Paragraph 2 sets forth the consequences of a default, while Paragraph 3 sets forth the consequences of payment.

¶ 111. Because National Operating defaulted on the Underlying Note and Mortgage, as the majority opinion concedes (majority op. at ¶ 13), paragraph 2 of the Agreement section of the Assignment becomes effective. As a result of this default and the provisions

of paragraph 2, MONY gained permission to exercise *all* of the rights to the Wrap Note and Mortgage, leaving National Operating *without recourse*. Paragraph 3 is immaterial, because National Operating had defaulted before offering payment of the Underlying Note and Mortgage to MONY.

¶ 112. I, therefore, conclude that, for the purposes of determining what material issuable facts were well pleaded in MONY's complaint for declaratory judgment, MONY was seeking all rights in the Wrap Note and Mortgage. Nowhere in its claim for all rights in the Wrap Note and Mortgage does MONY exclude National Operating's right to reconveyance, nor does MONY exclude National Operating's right to any surplus equity. It is important to note, again, that MONY asked in its complaint for the extinguishing of the rights of National Operating.

¶ 113. Having determined what was well pleaded in MONY's complaint for declaratory judgment, I now consider what was actually decided by the default declaratory judgment. After presenting its findings of fact and conclusions of law, the circuit court stated:

> IT IS ORDERED, ADJUDGED AND DECREED:
> 1. That the plaintiff [MONY] is entitled to a Declaratory Judgment pursuant to Section 806.04, Wis. Stats., as prayed for in plaintiff's Complaint and First Amended Complaint, and in accordance with the Findings of Fact, *confirming the assignment and assumption of the Notes* between the Defendant, National Operating, L.P., and the Defendant, Bridgeview Plaza Partnership, in LaSalle National Bank, as Indenture Trustee under an Indenture dated September 28, 1995; *extinguishing the rights of the Defendant, National Operating,*

*L.P., as a mortgagee under said Mortgage; extinguishing the rights of National Operating, L.P., as payee under the Note*; and confirming LaSalle National Bank, as Indenture Trustee under an Indenture dated September 28, 1995, as the primary mortgagee and holder of the Note and Mortgage declared herein.

Pl.-Appellant-Pet'r App. at 142–43 (emphasis added). I conclude that this judgment extinguished all of National Operating's rights under the Wrap Note and Mortgage, including the right to reconveyance and the right to any surplus equity. The judgment confirmed the relevant terms of the Assignment from National Operating to MONY, paragraphs 1 and 2. As stated above, the Assignment gave MONY all rights in the Wrap Note and Mortgage and permitted MONY to exercise those rights, leaving National Operating without recourse. Accordingly, the judgment confirmed that MONY had all rights on the Wrap Note and Mortgage, and that MONY could exercise those rights without recourse from National Operating.

¶ 114. Despite the broad language of MONY's complaint and of the default declaratory judgment, the majority opinion concludes that National Operating retained its right to reconveyance of the Wrap Note and Mortgage, and its right to any surplus equity. Majority op. at ¶¶ 96–98. In reaching this determination, the majority opinion relies on the fact that neither MONY's declaratory judgment complaint, nor the declaratory judgment itself specifically mentioned the right to reconveyance or any rights under Chapter 409. Majority op. at ¶¶ 80–81. However, as stated above, the broad language of the complaint, including the Assignment attached thereto, established what MONY was seeking, and the broad language of the declaratory

judgment established that it was granted all of the rights of National Operating to the Wrap Note and Mortgage. Consequently, there was no need for MONY to include a specific reference to National Operating's right to reconveyance or the right to any surplus equity.

¶ 115. In addition to the majority's misreading of MONY's complaint and the declaratory judgment, the majority opinion fails to take into account the common-law compulsory counterclaim rule as it relates indirectly to the present case. This rule provides that there are circumstances where the failure to raise a counterclaim in a prior action prevents related claims from being brought in a subsequent action. *A.B.C.G. Enters., Inc.*, 184 Wis. 2d at 476. These circumstances are when "a favorable judgment in the second action would nullify the judgment in the original action or impair rights established in the initial action." *Id.* at 476–77.

¶ 116. At issue in *A.B.C.G.* was the effect of six prior foreclosure actions on A.B.C.G.'s instant action for fraud and other claims. 184 Wis. 2d at 472. A.B.C.G. had defaulted in each of the prior actions. *Id.* at 471. A.B.C.G. contended that if claim preclusion barred the instant action, Wisconsin's permissive counterclaim doctrine would be transformed into a compulsory one. *Id.* at 473–74. The court concluded that the common-law compulsory counterclaim rule applied; that is, where a successful counterclaim would nullify a prior judgment or impair rights established in the initial action, that counterclaim is barred by claim preclusion. *Id.* at 480. The court found a common identity of parties and claims or causes of action. *Id.* at 481–82. The court also found that if A.B.C.G. was successful in the instant action, First Bank would have to return the property it recovered via foreclosure. *Id.* at 483. Corre-

spondingly, the court held that claim preclusion barred the subsequent fraud action. *Id.*

¶ 117. In a case where a party seeks to bar a claim based on the doctrine of claim preclusion, once it has been established that there is a common identity of parties and of claims or causes of action, there must be a determination of whether a judgment in favor of the party seeking to avoid claim preclusion would either nullify the previous judgment or impair rights established by the previous judgment. *Id.* at 476–77. If so, then that party's claims are barred by the doctrine of claim preclusion. *Id.* at 480.

¶ 118. In this case, a favorable judgment for National Operating would both nullify the default declaratory judgment granted in favor of MONY, and also would impair MONY's rights that were established by the default declaratory judgment. The default declaratory judgment gave MONY all rights to the Wrap Note and Mortgage. In its complaint, National Operating sought an injunction preventing MONY from disposing of the Wrap Note and Mortgage in an unreasonable manner, from selling the Wrap Note and Mortgage to Bridgeview, and from retaining any surplus equity. National Operating's First Am. Compl. at 12. In addition, National Operating sought a declaratory judgment holding that the Assignment required MONY to reconvey the Wrap Note and Mortgage to National Operating, upon satisfaction of the Underlying Note and Mortgage. *Id.* If the circuit court granted the injunctions and the declaratory judgment requested by National Operating, MONY would no longer possess all rights to the Wrap Note and Mortgage, nullifying the previous judgment and impairing MONY's rights established by the previous judgment.

¶ 119. I am not concluding that National Operating did not possess certain rights under Chapter 409. However, the time to raise those rights has passed. National Operating should have asserted these rights in an answer to MONY's complaint for declaratory judgment. When National Operating failed to do so, the circuit court granted a default declaratory judgment. The purpose of the doctrine of claim preclusion is to respect the finality of judgments and to prevent repetitive litigation. *DePratt v. West Bend Mut. Ins. Co.*, 113 Wis. 2d 306, 311, 334 N.W.2d 883 (1983). Based on the doctrine of claim preclusion, the default declaratory judgment must be appropriately applied here, so that National Operating is precluded from claiming its Chapter 409 rights in the present case.

¶ 120. In summary, I conclude that National Operating is barred from bringing its complaint by the doctrine of claim preclusion. Accordingly, I would affirm the decision of the court of appeals, that affirmed the judgment of the circuit court, which granted MONY's and Bridgeview's motion to dismiss, and denied National Operating's motion for partial summary judgment.

¶ 121. For the foregoing reasons, I respectfully dissent.

¶ 122. I am authorized to state that Justice JON P. WILCOX joins this opinion.