MENARD, INC., Plaintiff-Respondent-Petitioner,

v.

LITEWAY LIGHTING PRODUCTS, Defendant-Appellant.

Supreme Court

*No. 2003AP1391. Oral argument February 2, 2005.
—Decided June 29, 2005.*

2005 WI 98

(Also reported in 698 N.W.2d 738.)

For the plaintiff-respondent-petitioner there were briefs by *Stephanie L. Finn, Webster A. Hart* and *Herrick & Hart, S.C.,* Eau Claire, and oral argument by *Webster A. Hart.*

For the defendant-appellant there was a brief by *Carol S. Dittmar, Teresa E. O'Halloran* and *Garvey, Anderson, Johnson, Geraci & Mirr, S.C.,* Eau Claire, and oral argument by *Carol S. Dittmar.*

¶ 1. JON P. WILCOX, J.   Menard, Inc. (Menard) seeks review of a published court of appeals decision,

*Menard, Inc. v. Liteway Lighting Products,* 2004 WI App 95, 273 Wis. 2d 439, 685 N.W.2d 365, that reversed a judgment of the Eau Claire County Circuit Court, Lisa K. Stark, Judge, in favor of Menard and an order denying summary judgment to Liteway Lighting Products (Liteway).

¶ 2. The court of appeals concluded that Menard's lawsuit against Liteway, which seeks credit for allegedly defective products Menard returned to Liteway, was barred by the doctrine of claim preclusion based on Liteway's previous suit against Menard for nonpayment of invoices. *Id.,* ¶ 1. Because it is undisputed that all of the allegedly defective goods for which Menard seeks credit in its suit against Liteway were returned prior to Liteway's original action for unpaid invoices, the issue of returned products formed the basis of the dispute between the parties from the beginning, and allowing Menard to recover in the present case would undermine Liteway's original judgment, we conclude that Menard's suit is barred under the doctrine of claim preclusion and the common-law compulsory counterclaim rule. Therefore, we affirm the decision of the court of appeals.

## I. FACTUAL BACKGROUND
## AND PROCEDURAL POSTURE

¶ 3. Menard purchased lighting products from Liteway for approximately six years beginning sometime in late 1993 until December 1999. During their business relationship, Menard often held back sums of money due to Liteway as "credit" for products Menard claimed were defective. Following the cessation of their business relationship, the parties began disputing the amount of money Menard owed Liteway.

¶ 4. Menard filed a complaint against Liteway on August 23, 2001, alleging that it had returned some of the products due to their defective condition and that Liteway had not reimbursed it for the returns.[1] Menard alleged that as a result, Liteway had been unjustly enriched and that it breached its obligations under the Uniform Commercial Code (UCC). Menard sought damages in the sum of $315,345.54, representing the cost of all goods returned plus storage and shipping fees.

¶ 5. Liteway answered, asserting claim preclusion as an affirmative defense. Specifically, Liteway alleged that Menard's claims could have been brought in a prior action Liteway filed against Menard.

¶ 6. Liteway's previous action began on October 19, 2000, when it filed suit for breach of contract against Menard, seeking a money judgment of $354,954.77 for unpaid invoices on lighting fixtures as of September 1, 2000. The record indicates that Liteway attached copies of accounting records to its complaint in order to establish the amount owed by Menard. The record reflects that Menard stopped buying products from Liteway by at least December 1999, and that the parties began disputing the amount owed to Liteway as early as August 18, 1999. During oral argument before this court, counsel for Menard conceded that all the allegedly defective goods were discovered and returned to Liteway prior to the time when Liteway filed suit.

---

[1] While Menard's complaint stated that Liteway failed to reimburse it for any of the returns, Menard later admitted in its "Position Statement" that Liteway had, in fact, credited Menard for returns, although not in the amount claimed by Menard. Also it appears that not all of the defective goods were returned; according to Menard, some were "field destroyed" at Liteway's request.

¶ 7.   Menard's answer was due on December 11, 2000. On December 12, 2000, Liteway filed a motion for a default judgment. Menard, realizing it was in default, filed an untimely answer on December 12, 2000.[2] Menard also filed a motion to enlarge the time to respond to Liteway's complaint on this date. The Eau Claire County Circuit Court, Eric J. Wahl, Judge, granted Liteway's motion for default judgment on December 13, 2000, and docketed it on December 14, 2000.

¶ 8.   On December 27, 2000, a hearing was held on Menard's motion to enlarge the time to file its answer. During the hearing, Menard alleged that it should be allowed to answer based on excusable neglect. Menard also asserted that while it owed Liteway money, it was not the amount alleged in the complaint. Following the hearing, the circuit court entered an order on January 8, 2001, staying the effect of the default judgment for 30 days in order to provide Liteway an opportunity to respond to Menard's motion to enlarge the time to answer. The circuit court also strongly advised the parties to attempt to settle the matter out of court and stated its belief that Menard's failure to timely answer was not excusable neglect.

¶ 9.   On February 15, 2001, Menard filed a motion to extend the stay of enforcement of the default judgment. Attached to this motion was an affidavit of Dawn Sands, coordinator of Menard's legal department, which discussed the parties' dispute over the amount of money Menard owed Liteway. In the affidavit, Ms. Sands confirmed that Menard stopped buying products from Liteway by at least December 1999, and that the parties

---

[2] Apparently, there was some confusion between Menard's in-house counsel and outside attorney as to who was handling the case, although both knew of the Liteway suit.

began disputing the amount owed to Liteway as early as August 18, 1999. This affidavit also contained an internal company memorandum from Menard indicating that the dispute between the parties over amounts due to Liteway related to customer returns. The Menard memorandum stated: *"We have held back payment in order to cover future customer returns. . . . The difference between their numbers and our numbers are most likely customer returns."* (Emphasis added.)

¶ 10. On June 24, 2001, a status conference was held that resulted in the circuit court entering a scheduling order on July 27, 2001. The scheduling order directed Menard and Liteway to file briefs discussing, inter alia, whether Menard's failure to timely answer constituted excusable neglect and whether Menard's claims based on return of defective products would constitute compulsory counterclaims that would be precluded if the default judgment were to stand. Menard filed its brief on August 31, 2001, arguing: 1) the circuit court erred in granting the default judgment; 2) Menard's failure to timely answer was excusable neglect because of ongoing discussions with Liteway and miscommunication between Menard's legal staff; 3) Menard was entitled to a hearing on damages; and 4) Menard's claims for credit for defective products did not constitute compulsory counterclaims.

¶ 11. The same day Menard filed its brief, it filed the present action against Liteway. As noted, Menard alleged that Liteway had been unjustly enriched and that it breached its obligations under the UCC.

¶ 12. The circuit court subsequently entered an order lifting the stay on enforcement of the default judgment on October 9, 2001. The circuit court stated: "Menards has now attempted to avoid the effect of its default during December, 2000 by raising

various procedural arguments and again claiming its failure to answer within the statutory time limits was excusable." The court also noted that Menard had, in the year since the default judgment was entered, continuously attempted to litigate the dispute by raising various claims and defenses rather than attempting to resolve the controversy. Thus, the circuit court entered an order that lifted the stay on the default judgment and granted judgment to Liteway in the amount prayed for plus costs and one year's statutory interest. Menard did not satisfy the default judgment until November 16, 2001. *Menard,* 273 Wis. 2d 439, ¶ 24.

¶ 13. Menard's present action against Liteway proceeded before the Honorable Lisa K. Stark, and on November 16, 2001, Liteway filed a motion for summary judgment, arguing that Menard's action was barred by claim preclusion. In an oral ruling on February 7, 2002, the circuit court entered a partial ruling in favor of Menard but allowed Liteway to supplement the record before it entered a final decision. Liteway's supplement contained much of the circuit court record in its previous action. On May 3, 2002, the circuit court entered a formal order denying Liteway's motion for summary judgment.

¶ 14. The matter was tried to the court, and on April 14, 2003, a judgment was entered in favor of Menard. An amended judgment was filed on May 14, 2003, nunc pro tunc to May 12, 2003, in the amount of $140,478.41. On May 20, 2003, Liteway filed its notice of appeal.

¶ 15. The court of appeals reversed the judgment of the circuit court and its order denying summary judgment to Liteway. *Menard,* 273 Wis. 2d 439, ¶ 1. The court of appeals, addressing the issue of claim preclusion, concluded that Menard's claims against

591

Liteway were part of the same transaction that gave rise to Liteway's claims against Menard:

> A buyer's return of a set of goods for credit or an offset is a component of the transaction that began when the seller shipped those goods.
>
> . . . .
>
> . . . The common "nucleus of operative facts" is the exchange of goods for payment. The transaction will be complete when Menard no longer has a balance due and owing.

*Id.,* ¶¶ 14, 18.

¶ 16.    The court of appeals further reasoned:

> Liteway alleged sufficient information in its first complaint for us to conclude there was the single transaction as described above. It alleged that it sold fixtures to Menard on credit pursuant to a contract, that Menard accepted the goods, that Liteway sent invoices for payment, and that Menard refused to pay for the items. Menard's claimed return for credit of these items is part of the transaction Liteway pled.

*Id.,* ¶ 19.

¶ 17.    Next, the court of appeals concluded that all of Menard's claims could have been raised as affirmative defenses or counterclaims in Liteway's original action. *Id.,* ¶ 21. The court also noted that the factual predicates for both actions were in existence at the time Liteway filed suit. *Id.,* ¶¶ 22–24.

¶ 18.    Moreover, the court of appeals ruled that Menard's claims in its second suit were covered under the common-law compulsory counterclaim rule set forth in *A.B.C.G. Enterprises v. First Bank Southeast,* 184 Wis. 2d 465, 472, 515 N.W.2d 904 (1994). The court

of appeals reasoned that "Liteway established the amount at issue in the invoices in its pleadings[]" and "[a] judgment in favor of Menard would thus directly undermine the original default judgment that Judge Wahl determined to be proper under the circumstances." *Menard*, 273 Wis. 2d 439, ¶ 27.

¶ 19. Finally, the court of appeals concluded that claim preclusion contained a fundamental fairness prong and that it would not be fundamentally unfair "to preclude the claim Menard inexcusably neglected to pursue in the first action." *Id.*, ¶¶ 29, 31. The court of appeals noted that Menard failed to resolve the dispute during the year the default judgment was stayed, failed to appeal the default judgment, and instead attempted to undermine the original default judgment by instituting the present action in another branch of the circuit court. *Id.*, ¶¶ 30–31.

## II. ISSUE

¶ 20. The issue presented is whether a buyer's claims based on credit for returned goods are barred under the doctrine of claim preclusion and the common-law compulsory counterclaim rule when the seller had previously sued the buyer for breach of contract based on unpaid invoices, a default judgment was entered due to the buyer's failure to timely file an answer, the parties had terminated their business relationship prior to the instigation of the first suit, the defective goods were returned prior to the time the first lawsuit was filed, and the issue of credit for the defective goods was the basis of the entire dispute between the parties that led to the filing of the initial lawsuit. We hold that under these facts, the doctrine of claim preclusion and

the common-law compulsory counterclaim rule bar any subsequent suit by the buyer for credit for the returned goods.

¶ 21.   We conclude that for purposes of claim preclusion, Menard's claims in its second suit are part of the same transaction as the claims in Liteway's original suit because both suits arise from the same common nucleus of operative facts. It is uncontested that the dispute over the amount of money Menard owed Liteway on unpaid invoices was based on Menard's practice of taking a "credit" for defective products. Further, Menard's claims in its second suit could have been raised in Liteway's original action, as the parties had terminated their business relationship almost a year before Liteway filed its original complaint and all of the allegedly defective goods were returned prior to Liteway's action.

¶ 22.   Moreover, we conclude that Menard's claims fall under the common-law compulsory counterclaim rule because allowing Menard to proceed with its present suit would impair Liteway's rights as determined in the original action and would undermine the validity of the judgment Liteway obtained. Both suits involve the amount of money Menard owed Liteway, and Liteway could not have recovered the price of goods sold to Menard if those goods were defective. Therefore, because under the facts of this case, Menard's claims fall within the doctrine of claim preclusion and the common-law compulsory counterclaim rule, we affirm the decision of the court of appeals.

## III. STANDARD OF REVIEW

¶ 23.   This case concerns application of claim preclusion and the common-law compulsory counterclaim

594

rule. Whether claim preclusion and the common-law compulsory counterclaim rule apply to a given set of facts is a question of law that this court decides de novo. *N. States Power Co. v. Bugher,* 189 Wis. 2d 541, 551, 525 N.W.2d 723 (1995); *A.B.C.G. Enters.,* 184 Wis. 2d at 472.

## IV. ANALYSIS

¶ 24.   Menard advances several arguments as to why the claims it asserts in its suit against Liteway should not be barred under the doctrine of claim preclusion. Menard argues that the claims asserted in its suit against Liteway are not part of the same transaction that gave rise to Liteway's original suit. According to Menard, a claim based on the return of goods is not part of the same transaction as a claim seeking payment for the sale of those goods. Menard asserts that treating both claims as one transaction conflicts with a buyer's rights under the UCC.

¶ 25.   Further, Menard claims that applying claim preclusion and the common-law compulsory counter-claim rule in this instance would be inconsistent with Wisconsin's permissive counterclaim statute, Wis. Stat. § (Rule) 802.07(1) (1999–2000),[3] the limited effect of a default judgment, and fundamental fairness. Finally, Menard argues that this case should be governed by our decision in *National Operating L.P. v. Mutual Life Insurance Co. of New York,* 2001 WI 87, 244 Wis. 2d 839, 630 N.W.2d 116, rather than *A.B.C.G. Enterprises.* We disagree and affirm.

¶ 26.   Under the doctrine of claim preclusion, " ' "a final judgment is conclusive in all subsequent actions

---

[3] All subsequent references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

between the same parties [or their privies] as to all matters which were litigated *or which might have been litigated* in the former proceedings." ' " *N. States Power,* 189 Wis. 2d at 550 (quoting *Lindas v. Cady,* 183 Wis. 2d 547, 558, 515 N.W.2d 458 (1994)(in turn quoting *DePratt v. West Bend Mut. Ins. Co.,* 113 Wis. 2d 306, 310, 334 N.W.2d 883 (1983)))(emphasis added). Claim preclusion has three elements: "(1) an identity between the parties or their privies in the prior and present suits; (2) an identity between the causes of action in the two suits; and, (3) a final judgment on the merits in a court of competent jurisdiction." *Id.* at 551.[4] Claim preclusion "is 'designed to draw a line between the meritorious claim on the one hand and the vexatious, repetitious and needless claim on the other hand.' " *Id.* at 550 (quoting *Purter v. Heckler,* 771 F.2d 682, 689–90 (3d Cir. 1985)).

¶ 27.   Claim preclusion, in addition to precluding a plaintiff in a subsequent action from asserting claims that were litigated or could have been litigated in a prior action, may operate to preclude a plaintiff from asserting claims in a subsequent action that the party failed to assert in a previous action in which it was a

---

[4] Earlier this term in *Kruckenberg v. Harvey,* 2005 WI 43, ¶¶ 55, 62, 279 Wis. 2d 520, 694 N.W.2d 879, this court held that claim preclusion does not have a fourth, "fundamental fairness," element. We held that unlike issue preclusion, "claim preclusion is strictly applied[,]" *id.,* ¶ 53, and that "an ad hoc exception to the doctrine of claim preclusion cannot be justified simply by concluding that it is too harsh to deny an apparently valid claim by balancing the values of claim preclusion against the desire for a correct outcome in a particular case." *Id.,* ¶ 55. Therefore, we will not address Menard's arguments concerning the equities of applying claim preclusion in this case.

defendant. *A.B.C.G. Enters.*, 184 Wis. 2d at 480. Although "the general rule in Wisconsin [under Wis. Stat. § (Rule) 802.07(1)] is that where a defendant may interpose a counterclaim but fails to do so, he is not precluded from maintaining a subsequent action on that claim[,]" *id.* at 476, this court has adopted the common-law compulsory counterclaim rule set forth in the Restatement (Second) of Judgments § 22(2)(b)(1982). *Id.*

¶ 28. The common-law compulsory counterclaim rule creates an exception to the permissive counterclaim statute and bars a subsequent action by a party who was a defendant in a previous suit if "a favorable judgment in the second action would nullify the judgment in the original action or impair rights established in the initial action." *Id.* at 476–77. The common-law compulsory counterclaim rule operates to "preserve[] the integrity and finality of judgments and the litigant's reliance on them, by precluding a collateral attack upon a judgment in a subsequent proceeding when the attack *would completely undermine the rights established in the initial judgment.*" *Id.* at 477 (emphasis added).[5] Thus, for the common-law compulsory counterclaim rule to apply, a court must conclude that all the ele-

---

[5] Further, in relation to default judgments, the doctrine serves to provide certainty and finality to litigants because "defendants get better notice of what they will lose by default." Kevin M. Clermont, *Common-Law Compulsory Counterclaim Rule: Creating Effective and Elegant Res Judicata Doctrine*, 79 Notre Dame L. Rev. 1745, 1754 (Oct. 2004)[hereinafter "Elegant Res Judicata Doctrine"]. Although the dissent seems to question the legitimacy of the common-law compulsory counterclaim rule, it is clearly part of Wisconsin's established law. *See* Dissent, ¶¶ 69–70 & n.3.

ments of claim preclusion are present and that a verdict favorable to the plaintiff in the second suit would undermine the judgment in the first suit or impair the established legal rights of the plaintiff in the initial action. *Id.* at 480–82.

¶ 29. In the present case, there is no dispute that there is an identity of parties. In the first suit, Liteway sued Menard and obtained a default judgment. Further, as we recognized in *A.B.C.G. Enterprises,* a default judgment is a final judgment for purposes of claim preclusion. *Id.* at 481.[6] Thus, the resolution of the present case depends upon whether there is an identity of claims in the two suits and whether a verdict in favor of Menard in the second suit would completely undermine the judgment Liteway obtained in the first suit or would impair any legal rights of Liteway that were established in the first suit.

¶ 30. We now proceed to examine whether there is an identity of claims in Liteway's original suit and Menard's present suit. For purposes of determining whether there is an identity of claims in the two actions, Wisconsin has adopted the "transactional approach" from the Restatement (Second) of Judgments § 24 (1982). *N. States Power,* 189 Wis. 2d at 553.

> In determining whether there is an identity of causes of action we must examine the causes of action in both suits within the framework of the transactional analysis adopted from the Restatement (Second) of Judgments § 24 (1982). *DePratt,* 113 Wis. 2d at 311. "Under this analysis, all claims arising out of one transaction or

---

[6] *See also National Operating L.P. v. Mut. Life Ins. Co. of N.Y.,* 2001 WI 87, ¶ 105, 244 Wis. 2d 839, 630 N.W.2d 116 (Crooks, J., dissenting).

factual situation are treated as being part of a single cause of action and they are required to be litigated together." *Parks v. City of Madison,* 171 Wis. 2d 730, 735, 492 N.W.2d 365 (Ct. App. 1992). The concept of a transaction, "connotes a natural grouping or common nucleus of operative facts." Restatement (Second) of Judgments § 24 cmt. b. (1982). In determining if the claims of an action arise from a single transaction, we may consider whether the facts are related in time, space, origin, or motivation. *Id.*

*A.B.C.G. Enters.,* 184 Wis. 2d at 480–81.

¶ 31.   Menard argues that the two suits here do not arise out of the same transaction because Liteway's original suit was a contract action based on nonpayment of invoices, whereas Menard's suit is based on a breach of obligations under the UCC. Menard states that it is seeking to enforce separate and distinct rights under the UCC and takes issue with the court of appeals' conclusion that "in the realm of the sale of goods, shipment by the seller and acceptance or return by the buyer deserve 'treatment as a unit[.]' " *Menard,* 273 Wis. 2d 439, ¶ 18. Although we do not agree with the bright-line rule established by the court of appeals, we nonetheless conclude that the claims in Liteway's original suit and Menard's present suit are part of the same transaction.

¶ 32.   Under the transactional analysis, it is irrelevant that "the legal theories, remedies sought, and evidence used may be different between the first and second actions. The concept of a transaction connotes a common nucleus of operative facts." *Kruckenberg v. Harvey,* 2005 WI 43, 279 Wis. 2d 520, 694 N.W.2d 879, ¶ 26. Thus, the fact that Menard is asserting different substantive legal theories arising from rights and obli-

gations under the UCC in its suit is not dispositive. *See* Restatement (Second) of Judgments § 24 cmt c. (1982).[7]

> The goal in the transactional approach is to see a claim in factual terms and to make a claim coterminous with the transaction, *regardless of the claimant's substantive theories or forms of relief,* regardless of the primary rights invaded, and regardless of the evidence needed to support the theories or rights.

*Kruckenberg,* 279 Wis. 2d 520, ¶ 26 (emphasis added).[8]

¶ 33. Furthermore, the fact that the sale of goods and the return of those goods may be considered separate "financial transactions" in common parlance is not dispositive. "[T]he concept of a transaction is here used in the broad sense it has come to acquire in the interpretation of statutes and rules governing pleading and other aspects of civil procedure. Thus the overtones of voluntary interchange often associated with the term in normal speech do not obtain." Restatement (Second)

---

[7] We do not ignore the fact that Menard has rights under the UCC. *See* dissent, ¶ 58. However, that is not the issue in this case. The issue is the appropriate time for Menard to assert those rights. As demonstrated *infra,* the fact that Menard is asserting rights originating from the UCC, as opposed to the common law, bankruptcy code, or other substantive body of law, is simply not of importance under the transactional analysis set forth in the Restatement (Second) of Judgments. The source of the right or the type of legal theory asserted is not relevant; it is the factual basis for that right which controls.

[8] The dissent simply refuses to acknowledge this legal authority that clearly provides the existence of different theories of relief is irrelevant for purposes of the transactional analysis. Dissent, ¶ 62 (asserting that there is no identity of claims because the two suits involved "different legal theories").

of Judgments § 24 cmt b. (1982).[9] Therefore, the fact that "[in] everyday business, the sale, delivery and responsibility on invoices is commonly understood to be one transaction and the subsequent return . . . a separate transaction[,]" Resp't Br. at 18, is irrelevant for purposes of a claim preclusion analysis. In sum, the transactional approach views claims under a pragmatic standard that focuses on whether the two causes of action arise out of the same common set of material facts. *See* Restatement (Second) of Judgments § 24 cmt b. (1982).

¶ 34.   An additional consideration applies in the present case because Liteway's original suit resulted in a default judgment. For purposes of claim preclusion: "The conclusiveness of a default judgment . . . 'is limited to the material issuable facts which are well pleaded in the declaration or complaint. The judgment does not extend to issues which were not raised in the pleadings.' " *A.B.C.G. Enters.*, 184 Wis. 2d at 481 (quoting *Klaus v. Vander Heyden,* 106 Wis. 2d 353, 359–60, 316 N.W.2d 664 (1982)).

¶ 35.   Liteway's original complaint alleged, in part, as follows:

### Breach of Contract

3. From time to time, Menards requested Liteway sell Menards certain Lighting Fixtures, supplies and equipment . . . on credit. Liteway sold and shipped the Lighting Fixtures to Menards on credit.

4. Liteway sent invoices for payment of the pur-

---

[9] Again, the dissent refuses to acknowledge this authority and proceeds to utilize the term "transaction" in the colloquial financial context. *See* dissent, ¶ 60.

chase price of the Lighting Fixtures ... to Menards. Copies of Liteway's accounting records showing the dates and amounts of the Invoices sent to Menards are attached as Exhibit "A."

5. Despite demand, Menards has failed and refused to pay the Invoices.

6. The unpaid balance on the Invoices as of September 1, 2000, is $354,954.77.

7. Failure of Menards to pay for the Lighting Fixtures constitutes a breach of contract with Liteway.

Liteway also alleged causes of action for "Open Account," "Goods Sold," and "Bad Faith" based on these facts and demanded a judgment in the sum of $354,954.77, plus interest and incidental damages.

¶ 36. In the present suit, Menard sought a judgment of $315,345.54 for goods returned to Liteway. According to Menard's complaint, it purchased goods from Liteway beginning around 1994 until December of 1999. It is undisputed that the parties stopped doing business after December 1999. Liteway commenced its original action on October 19, 2000, for unpaid invoices as of September 1 of that year. It is also undisputed that Menard purchased these products from Liteway on credit. Further, Menard has conceded that all the allegedly defective goods that it returned to Liteway were returned before Liteway instituted its original action.[10] An affidavit filed by one of Menard's attorneys

---

[10] Although the dissent states that the record reflects 99 invoices for returned products after Liteway filed its suit, this is an inaccurate reading of the record. Dissent, ¶ 61. Menard submitted an exhibit, titled "Returned Product Summary Chart," that unambiguously indicates the last "chargeback" for returned goods to Liteway was claimed as of May 16, 2000, more

clearly states that the parties began disputing how much money Menard's owed Liteway as of August 18, 1999, and that while Menard conceded it owed *some*

---

than five months *before* Liteway filed its original action. The "invoices" to which the dissent refers are invoices of the times and amounts Liteway reimbursed or "credited" Menard for its allegedly defective returns. These records do not reflect that any goods were actually returned after Liteway filed its suit, only that Liteway provided credit after that date. Thus, in addition to the concession from counsel, Menard's own records indicate that the last time it returned product was May 16, 2000, a full five months *before* Liteway's suit. At no point does the record reflect Menard actually returned goods after May 16, 2000.

In addition to being factually incorrect, the dissent places the cart before the horse. The issue here is whether Menard's suit should have been allowed to proceed in the first instance. While the record from Menard's subsequent suit may reflect that Liteway provided some credit after it filed its suit, the time for Menard to argue that the sum demanded by Liteway was incorrect was in Liteway's original action.

Further, if it is appropriate to consult the trial record from the second suit, we note in its pre-trial filings regarding the applicability of claim preclusion, Liteway attached as Exhibit C, a copy of Menard's untimely answer in the first suit, in which Menard "[a]ffirmatively allege[d] that Menards had to return product sent to it by Liteway as being defective or unsuitable and allege[d] that Liteway has failed to properly credit Menard for those return shipments." In addition, Menard "[a]ffirmatively allege[d] that there has been an ongoing good faith dispute with Liteway over what sums of money, if any, Menard, Inc. owes to Liteway." It was Menard's position that "Liteway has miscalculated its claimed amounts due and has not properly credited Menard, Inc. for any returned product or product not accepted by Menard, Inc." In sum, the record reflects that the claims being asserted by Menard in its second suit are precisely the same defenses it attempted to assert in Liteway's original suit.

money to Liteway for the goods it purchased on credit, it disputed the sum claimed by Liteway.

¶ 37.   Moreover, an internal memorandum from one of Menard's attorneys that was filed as an exhibit plainly states that Menard disputed the sum claimed by Liteway because of the amount it took as an "offset" for damaged and returned goods:

> Bottom line—we stopped purchasing product from Liteway in mid-December. *We have held back payment in order to cover future customer returns. . . .*
>
> . . . *The difference between their numbers and our numbers are most likely customer returns.* There was a history of customer return discrepancies with Liteway that we always worked out after providing proofs of deliveries, etc. *They have always claimed that they did not receive back the same amount of product that we deducted for.*

(Emphasis added.)

¶ 38.   Therefore, it is clear that all the facts giving rise to Menard's suit were in existence at the time Liteway filed its original action. More importantly, it is obvious that these facts formed the foundation of both lawsuits. Liteway sold goods to Menard on credit. Menard returned some of the goods as allegedly defective and took a "credit" for these and future customer returns. Liteway demanded payment on the open accounts. The parties stopped doing business and Menard did not pay the sum demanded by Liteway for the invoices *because* it disputed the amount of "credit" to which it was entitled for the returned goods. The claims Menard asserts in its second suit are not based on a separate series of underlying events; rather, they are defenses and counterclaims to Liteway's original claims and are premised on the same common nucleus of operative facts.

604

> That a number of different legal theories casting liability on an actor may apply to a given episode does not create multiple transactions and hence multiple claims. This remains true although the several legal theories depend on different shadings of the facts, or would emphasize different elements of the facts, or would call for different measurements of liability or different kinds of relief.

Restatement (Second) of Judgments § 24 cmt. c (1982).

¶ 39. Thus, we conclude that the two causes of action constituted a single "transaction" for purposes of claim preclusion.[11] Such a conclusion does not expand the conclusiveness of Liteway's default judgment beyond the material issuable facts that were well pleaded

---

[11] Contrary to the dissent's assertion that "[c]ommon sense dictates that thousands of purchases and returns over such a long period of time cannot constitute a single transaction for the purposes of claim preclusion[,]" Dissent, ¶ 60, under the Restatement (Second) of Judgments, such a series of events can, in law, constitute a single transaction if both suits are based on that entire series of events or connected transactions. Restatement (Second) of Judgments, § 24 (1982). Liteway's original suit encompassed all of the purchases for which it was not paid. Clearly, Liteway and Menard had terminated their business relationship almost a full year before Liteway commenced its action against Menard. As discussed *infra,* Menard had retuned all of the allegedly defective goods prior to Liteway's suit. Menard's suit now seeks reimbursement for a number of those purchases. Thus, both suits relate to the same series of events.

What common sense does dictate is that a party should not be permitted to sit back and allow a default judgment to be entered against it, through its own inexcusable neglect, and then attempt to circumvent the effect of that default judgment by raising its original defenses and counterclaims as a separate action under the UCC, in a different branch of the circuit court.

in Liteway's complaint because Liteway's original complaint plainly raised the issue of the amount of money Menard owed on the open invoices. Menard disputed the amount claimed by Liteway *because* of the "credit" it took for customer returns of allegedly defective products. The reasons *why* Menard asserts it does not owe as much as Liteway originally claimed are not unpleaded issues or new transactions; they are merely defenses and/or counterclaims to Liteway's original claims based on the same set of facts as Liteway's claims. *See A.B.C.G. Enters.,* 184 Wis. 2d at 482.[12] Despite the different substantive theories asserted by Menard, its position has always been that Liteway was not entitled to as much money as it claimed because Menard was entitled to an offset for defective products that were returned. *See N. States Power,* 189 Wis. 2d at 555. In the end, both suits raise the single issue of how much money Menard owed Liteway for the goods Liteway sold to Menard on credit.[13]

---

[12] The dissent fails to appreciate that the ultimate issue in both suits is how much money Menard owed Liteway. This issue was clearly pleaded in Liteway's original suit. Menard's claims in its subsequent suit are merely reasons *why* it believes it is not liable for the sum Liteway claimed. What Menard should have asserted as defenses and/or counterclaims in the first action have now been re-characterized by Menard as affirmative causes of action in Menard's subsequent suit. The dissent relies heavily on the fact that Liteway did not, in its complaint, "address any issue relating to Menard's rights to return defective, damaged and unsatisfactory products for credit . . . ." Dissent, ¶ 64. However, we are aware of no rule of law that requires a claimant to predict and respond to potential defenses and counterclaims of the party it is suing in its complaint.

[13] Menard relies heavily upon the fact that its suit involves the obligations of a seller of goods who has maintained an action for the price of goods under Wis. Stat. § 402.709. In addition to

¶ 40.   However, we do not go as far as the court of appeals' conclusion that "in the realm of the sale of goods, shipment by the seller and acceptance or return by the buyer deserve 'treatment as a unit[.]' " *Menard,* 273 Wis. 2d 439, ¶ 18. The UCC expressly provides the buyer of goods with a reasonable time to reject nonconforming goods and seasonably notify the seller, Wis. Stat. § 402.606(1), and allows a buyer to revoke acceptance of nonconforming goods within a reasonable time after the buyer discovers or should have discovered the nonconformity. Wis. Stat. § 402.608. It is entirely plausible that in some cases, a buyer may not in fact discover the nonconformity, or legally be required to discover the nonconformity, until after the seller has obtained a judgment in a suit for the price of the goods. The court of appeals' decision would hold that any subsequent action based on the return of the goods was part of the same transaction as the original suit. Such a conclusion would clearly interfere with a buyer's rights under the UCC in some circumstances.

¶ 41.   Under a correct application of the transactional analysis, this result would be avoided. The Restatement (Second) of Judgments § 24 cmt f. (1982)

again emphasizing that the substantive theories of recovery asserted are irrelevant for purposes of claim preclusion, we note that in an action for price under the UCC, a seller of goods may recover only the price of "goods accepted or of conforming goods lost or damaged within a commercially reasonable time after risk of their loss has passed to the buyer." Wis. Stat. § 402.709(1)(a). Thus, the fact that the goods were accepted or conforming is a necessary prerequisite to recovery in an action for price. As such, the question of whether the goods sold were accepted and/or conforming is part of the issues raised in an action for the price of goods.

607

provides: "Material operative facts occurring after the decision of an action with respect to the same subject matter may in themselves, or taken in conjunction with the antecedent facts, comprise a transaction which may be the basis of a second action not precluded by the first." This exception is consistent with the "pragmatic" view of what constitutes a transaction, in that it takes into account whether the operative facts are separated by time. *See A.B.C.G. Enters.,* 184 Wis. 2d at 481.

¶ 42. Had Menard not discovered that Liteway's goods were defective and nonconforming until after Liteway's default judgment, it would have a good argument that the separation in time between the facts in the two suits was sufficient to render its return of the defective goods a separate transaction. However, here, Menard has conceded that all of the allegedly defective goods for which it seeks credit were discovered and returned to Liteway prior to Liteway's original suit. It is uncontested that the parties stopped doing business almost a year prior to Liteway's original suit and that the issue of customer returns of defective products was the root of their dispute. Thus, Menard's claims could clearly have been raised in Liteway's prior suit. *See N. States Power,* 189 Wis. 2d at 555 ("[T]he transactional view of claim preclusion requires 'the presentation in the action of all material relevant to the transaction without artificial confinement to any substantive theory or kind of relief ....' ")(quoting *DePratt,* 113 Wis. 2d at 311–12).

¶ 43. The fact that all of the allegedly defective goods were returned prior to Liteway's original suit is precisely what distinguishes this case from *National Operating.* In that case, a debtor, National Operating, borrowed a substantial sum of money from MONY to purchase commercial real estate. *Nat'l Operating,* 244

608

Wis. 2d 839, ¶¶ 4–7. The loan was secured by a mortgage note. *Id.,* ¶ 7. Later, the debtor sold the property to another company, Bridgeview, in exchange for a wrap-around note, which required monthly payments in excess of National Operating's monthly obligation to MONY. *Id.,* ¶ 8. The parties renegotiated the loan after MONY called the loan. *Id.,* ¶¶ 9–11. As part of the renegotiation, National Operating assigned certain rights in the Bridgeview wrap-note to MONY. *Id.,* ¶ 11. National Operating eventually defaulted, and MONY instituted a declaratory judgment action seeking to confirm its assumption of the wrap-note and the extinguishment of National Operating's rights under the note and mortgage. *Id.,* ¶¶ 13, 15.

¶ 44. National Operating failed to answer, and a default judgment was entered. *Id.,* ¶¶ 13, 17. As a result of the declaratory judgment, MONY stepped into National Operating's shoes, took over the wrap-note and the mortgage, and began to receive monthly payments from Bridgeview. *Id.,* ¶ 18. Subsequently, MONY and Bridgeview entered into an agreement whereby Bridgeview would satisfy the total amount outstanding on the wrap-note for less than the total amount due, but for more than the total amount due on National Operating's underlying note. *Id.,* ¶ 19. When National Operating became aware that MONY intended to keep the difference, it filed suit against MONY, contending that MONY was unlawfully disposing National Operating's collateral in violation of Article 9 of the UCC. *Id.,* ¶¶ 20–21.

¶ 45. Thus, National Operating's suit was based on a different transaction—MONY's alleged unlawful conversion of collateral—than MONY's original suit—National Operating's default on its loan. Further, National Operating's suit was based on facts that did not

exist at the time of MONY's original suit. *See* Restatement (Second) of Judgments § 24 cmt. f & illus. 10 (1982). Therefore, *National Operating* is factually distinguishable from the present case.

¶ 46.   Having concluded that Menard's claims in this case are part of the same transaction that gave rise to Liteway's claims, we now turn and address the final element of the common-law compulsory counterclaim rule—whether a judgment in favor of Menard in its suit would undermine Liteway's judgment or impair the rights of Liteway that were established in the previous action.

¶ 47.   We begin by again emphasizing that Wisconsin, by statute, is a permissive counterclaim state. *See* Wis. Stat. § (Rule) 802.07(1). In *A.B.C.G. Enterprises,* 184 Wis. 2d at 480, this court carved out a narrow exception to our permissive counterclaim statute by adopting the common-law compulsory counterclaim rule as set forth in the Restatement (Second) of Judgments § 22(2)(b)(1982). The rule applies only where a favorable verdict to the plaintiff in the second suit would undermine the judgment in the first suit or impair legal rights established in the first suit. *Id.* at 477, 480–82.

¶ 48.   However, we note that the Restatement's formulation of the common-law compulsory counterclaim rule "applies whether or not the prior judgment was by default. The rule indeed is especially important because it works to guarantee that even default judgments mean something and cannot normally be undone by later litigation." *Elegant Res Judicata Doctrine* at 1753. Further, the common-law compulsory counterclaim rule "emerged as a specific aspect of the broad principle whereby a valid and final judgment generally precludes the defendant from later asserting mere

defenses to the claim." *Id.* at 1756. Thus, the Restatement's view of the common-law compulsory counterclaim rule "indicates at least that the application of the rule to a judgment should not 'be affected by the course of the first case' in terms of default, dismissal, or the like." *Id.*

¶ 49. Examining the facts of this case, it is clear that the present case is governed by the reasoning of this court in *A.B.C.G. Enterprises.* In that case, First Bank, the mortgagee, sued ABCG, seeking to foreclose its interests in certain properties pursuant to mortgage assumption agreements. *A.B.C.G. Enters.*, 184 Wis. 2d at 471. ABCG did not defend, and First Bank obtained a default judgment. *Id.* Later, ABCG filed suit against First Bank, asserting that First Bank's breach of contract, misrepresentations, and failure to properly manage the properties and collect rental payments caused ABCG to default on its mortgage obligations and lose its interest in the properties. *Id.* at 471–72.

¶ 50. After concluding that both suits arose from the same transaction, *id.* at 481–82, this court concluded that a judgment favorable to ABCG would nullify the default judgment entered in First Bank's prior foreclosure action:

Essentially, ABCG alleges that the original foreclosure was improper. First Bank established the validity of ABCG's mortgage obligation; ABCG claims that its obligation was not valid because of misrepresentations by First Bank. First Bank established that ABCG was in default; ABCG alleges that absent the Bank's action, it would not be in default. Finally, First Bank established the amount at issue in the mortgages; ABCG attempts to put the amount at issue again by alleging that payments were not properly received and applied to the mortgage debt. A judgment in favor of ABCG

611

would thus directly undermine the original default judgment in which the court held that under the circumstances, foreclosure was proper.

> If we were to allow ABCG to recover damages from First Bank, or if we were to grant other "equitable" remedies (as ABCG requests), the judgment awarding First Bank the amounts due on the properties and additional costs would be rendered meaningless. If a court found the mortgages invalid or First Bank to have caused the default, First Bank could be essentially forced to return its previous recovery. In the interest of equity and finality, we hold that ABCG is barred from raising its present claims against First Bank.

*Id.* at 482–83.

¶ 51. Likewise, here, Liteway established the amount due and owing on its open invoices for the goods it sold to Menard in the first action. Now, Menard essentially challenges that amount by claiming that some of the goods for which it did not pay were defective and nonconforming. Menard attempts to put the amount of the judgment in issue by claiming that Liteway did not properly credit it for returned goods that were allegedly defective and was thus unjustly enriched. As evidenced by the Menard internal memorandum discussed *supra*, Menard's claims for credit for defective products were always integrally related to Liteway's demand for payment on open invoices and were always the means by which Menard contested the amount claimed by Liteway on those invoices. As counsel for Menard stated in an affidavit: "Menard, Inc. has consistently disputed the amount of damages as requested in [Liteway's] Complaint and as set forth in the default judgment." Further, Menard admitted during the course of its lawsuit that Liteway did provide some credit to Menard for returned goods, although

Menard claimed it was entitled to a greater amount. Both suits involve the amount of money Menard owed Liteway.[14]

■

¶ 52.   Moreover, as discussed *supra,* a recovery for the price of goods sold under the UCC is dependent upon those goods being accepted or conforming. *See* Wis. Stat. § 402.709(1)(a). By claiming that some of the products Liteway sold were defective, Menard is necessarily attacking the legitimacy of Liteway's original judgment. A seller in an action for price of goods sold may recover only the price of "goods accepted or of conforming goods lost or damaged within a commercially reasonable time after risk of their loss has passed to the buyer." Wis. Stat. § 402.709(1)(a). Liteway could therefore not have recovered the price of goods that were nonconforming or whose acceptance was lawfully revoked. By now alleging that some of these goods were defective and that it is entitled to credit for these goods, Menard is necessarily challenging the very premise of Liteway's original suit:   that Liteway sold conforming goods for which it was not paid. A judgment in favor of Menard based on returns of defective products would thus directly undermine the original default judgment.

---

[14] In addition to falling squarely within the rationale of *A.B.C.G. Enterprises v. First Bank Southeast,* 184 Wis. 2d 465, 515 N.W.2d 904 (1994), this case is closely analogous to the following illustration in the Restatement:

> 9. A brings an action against B for failure to pay the contract price for goods sold and delivered and recovers judgment by default. After entry of final judgment and payment of the price, B brings an action against A to rescind the contract for mutual mistake, seeking restitution of the contract price and offering to return the goods. The action is precluded.

Restatement (Second) of Judgments § 22 illus. 9 (1982).

Were we to allow Menard to enforce its judgment in the second action, Liteway would essentially be forced to return a portion of its previous recovery. Menard's suit is merely an attempt to collaterally attack the original judgment by raising defenses and counterclaims to Liteway's original suit and avoid the circuit court's determination that the failure to raise these claims in a timely fashion did not constitute excusable neglect.

¶ 53.   Again, Menard argues that this case should be governed by *National Operating* and not *A.B.C.G. Enterprises*. However, *National Operating* is again distinguishable. First, the prior judgment in *National Operating* arose from a declaratory judgment action, the preclusive effect of which is limited to those matters pled with sufficient clarity. *Nat'l Operating,* 244 Wis. 2d 839, ¶¶ 17, 93. The court in *National Operating* concluded that the claims in National Operating's subsequent suit raised issues concerning certain rights that National Operating possessed in the wrap-note, which rights were not implicated in MONY's prior declaratory judgment complaint. *Id.,* ¶¶ 94–96. While, as discussed *supra,* the preclusive effect of a default judgment is limited to those matters actually litigated, we have already determined that Liteway's prior suit raised the issue of how much Menard owed on the open invoices and that Menard's present suit is simply a means of collaterally challenging this amount.

■■■■

¶ 54.   Thus, we conclude that all the prerequisites to the application of claim preclusion and the common-law compulsory counterclaim rule are present in this

case.[15] Therefore, we conclude that Menard is barred from maintaining its present suit against Liteway.[16]

## V. CONCLUSION

¶ 55. We conclude that for purposes of claim preclusion, Menard's claims in its second suit are part of the same transaction as the claims in Liteway's original suit because both suits arise from the same common nucleus of operative facts. It is uncontested that the dispute over the amount of money Menard owed Liteway on unpaid invoices was based on Menard's practice of taking a "credit" for defective products. Further, Menard's claims in its second suit could have been raised in Liteway's original action as the parties had terminated their business relationship almost a year

---

[15] We again note that the instances in which the common-law compulsory counterclaim rule "applies are to be distinguished from instances in which the defendant has grounds for relief from the judgment that were not available to him in the form of a counterclaim in the original action." Restatement (Second) of Judgments § 22 cmt. f. (1982).

[16] Finally, we are perplexed by the assertion of the dissent that this opinion "only encourages acrimony and distrust between buyer and seller[.]" Justice Crooks' dissent, ¶ 15. Were the relationship between Menard and Liteway not acrimonious and distrustful, the parties would still be doing business or would have resolved their dispute out of court, as suggested by the circuit court in the first lawsuit. It is precisely because of such acrimony and distrust that the parties ceased doing business and began to litigate this dispute. What this opinion does do is encourage parties to be vigilant and timely assert their claims. It discourages a party from allowing a default judgment to be entered against it and then, through artful pleading, attempting to avoid the effect of that judgment by asserting as new claims what it intended to assert as defenses and counterclaims had the default judgment not been entered.

before Liteway filed its original complaint and all of the allegedly defective goods were returned prior to Liteway's action.

¶ 56. Moreover, we conclude that Menard's claims fall under the common-law compulsory counterclaim rule because allowing Menard to proceed with its present suit would impair Liteway's rights as determined in the original action and would undermine the validity of the judgment Liteway obtained. Both suits involve the amount of money Menard owed Liteway, and Liteway could not have recovered the price of goods sold to Menard if those goods were defective. Menard certainly has rights under the UCC, but the occasion to timely assert those rights has passed. Therefore, because under the facts of this case, Menard's claims fall within the doctrine of claim preclusion and the common-law compulsory counterclaim rule, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 57. N. PATRICK CROOKS, J. (*dissenting*). I strongly disagree with the majority that Menard's lawsuit against Liteway is barred by the doctrine of claim preclusion.[1] The majority concludes that all three ele-

---

[1] Claim preclusion provides that a final judgment on the merits in one action bars parties from relitigating any claim that arises out of the same relevant facts, transactions, or occurrences. *Kruckenberg v. Harvey,* 2005 WI 43, ¶ 19, 279 Wis. 2d 520, 694 N.W.2d 879. In Wisconsin, the doctrine of claim preclusion has three elements: identity of the parties or those in privity with the parties in the first and second suits, identity of the causes of action in the first and second suits, and the prior litigation must have ended in a final, valid judgment on the merits. *Id.,* ¶ 21.

ments for claim preclusion are present and, additionally, that Menard was required to raise its claims in the action brought by Liteway pursuant to the common-law compulsory counterclaim exception to Wisconsin's permissive counterclaim statute, Wis. Stat. § (Rule) 802.07(1) (1999–2000)[2] I respectfully dissent because there is no identity of claims or causes of action between the first and second suits involving these parties, and Menard's claim here does not come within the narrow exception to Wisconsin's permissive counterclaim statute.

¶ 58. The majority concludes that, for the purposes of claim preclusion, the transactional approach set forth in the Restatement (Second) of Judgments, § 24 (1982) describes the correct methodology for determining whether there is an identity of claims or causes of action. While I do not dispute this, I disagree with the majority's conclusion that the thousands of transactions between these parties over a six-year period involving the purchase of goods and the return of defective, damaged and unsatisfactory products to Liteway constitute one transaction as a matter of law. In reaching such a conclusion, the majority makes the same mistake as the court of appeals—it fails to apply the Uniform Commercial Code (UCC). The court of appeals dismissed Menard's UCC claims as "nothing more than affirmative defenses and counterclaims— various theories or kinds of relief counterposed to Liteway's claim." *Menard, Inc. v. Liteway Lighting Prods.*, 2004 WI App 95, ¶ 21, 273 Wis. 2d 439, 685 N.W.2d 365. Like the court of appeals, the majority ignores the UCC in this case.

---

[2] Unless otherwise indicated all references to the Wisconsin Statutes are to the 1999–2000 edition.

¶ 59.  As the governing law in Wisconsin on contractual disputes, *see* Wis. Stat. §§ 401.101–411.901, such as those involved here, the UCC is highly relevant to determining what constitutes a transaction for the purposes of claim preclusion. Restatement (Second) § 24(2) states:

> What factual grouping constitutes a "transaction", and what groupings constitute a "series", are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, *and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.*

(Emphasis added.) When the Wisconsin Legislature adopted the UCC, it did so to "permit the continued expansion of commercial practices *through custom, usage and agreement of the parties.*" Wis. Stat. § 401.102(2)(b) (emphasis added); *see also Mayberry v. Volkswagen of Am., Inc.,* 2005 WI 13, 278 Wis. 2d 39, 692 N.W.2d 226. The UCC was adopted to give commercially sophisticated parties the opportunity to conduct business and resolve disputes in an efficient manner, based on business understanding, usage, and custom in their respective businesses. Its provisions are clearly relevant in determining the expectation of the parties, their business understanding, usage, and custom in the businesses involved here. I can think of nothing more relevant for such an inquiry than the applicable law of Wisconsin. This court has stated:

> The Uniform Commercial Code is one of the preeminent achievements of American law. It is constantly under review so that it can address changing practices in the world of commerce. Our role as a court is not to

question the effect of Code provisions in a particular case. Our role is to apply the law.

*Nat'l Operating, L.P. v. Mut. Life Ins. Co. of N.Y.*, 2001 WI 87, ¶ 99, 244 Wis. 2d 839, 630 N.W.2d 116 (footnote omitted). I therefore cannot accept the majority's position that the provisions of the UCC in regard to the sale and subsequent return of goods being separate transactions are "irrelevant." Majority op., ¶ 33.

¶ 60.    Turning to the UCC, it seems clear from its structure and language that the purchase of goods and the return of goods involve separate transactions. The UCC sets out separate rights and remedies for sellers in the Code, *see* Wis. Stat. § 402.703, and specifically gives a buyer the right to revoke its acceptance of goods within a commercially reasonable time. *See* Wis. Stat. § 402.608(2). In this case, the trial record from Menard's action against Liteway reveals the extensive relationship that Menard and Liteway had in the six years they did business together. The bills of lading from January 1999–May 2000 alone show over 300 separate shipments of returned products from Menard to Liteway in those months. There were literally thousands of purchases and returns over the six-year course of dealing between the two companies. The exchanges between Liteway and Menard totaled nearly $18 million over the six years that they did business with each other. Common sense dictates that thousands of purchases and returns over such a long period of time cannot constitute a single transaction for the purposes of claim preclusion.

¶ 61.    Although Menard's attorney seemed to concede at oral argument that Menard had, prior to the filing of Liteway's suit, invoiced Liteway for all of the returned products, exhibits from the circuit court

record in this case clearly demonstrate that reimbursement transactions continued well after Liteway filed its lawsuit against Menard. During discovery in the current lawsuit, Menard submitted an interrogatory to Liteway asking for the complete list of reimbursements from Liteway to Menard from 1995 forward. The records that Liteway provided in response revealed 99 invoices dated after October 19, 2000, the date of commencement of Liteway's action against Menard. It appears quite clear that Liteway was still providing reimbursement or credit to Menard for returned defective products months after the date its action against Menard was filed, and thus that the two companies still had unsettled disputes involving such defective products for a considerable time after the commencement of Liteway's suit.

¶ 62. In the decision of the Eau Claire County Circuit Court, Judge Lisa Stark presiding, the court correctly denied Liteway's motion for summary judgment in Menard's action. The court's reasoning was as follows:

> Looking at the transactional analysis, you have to look, as the Liteway attorneys point out, at the facts that are underlying each claim, and if, indeed, I am correct, Judge Wahl's analysis is based on the Complaint, which basically said there were goods sold by Liteway to Menards (sic). They were delivered, they weren't paid for and they're entitled to the unpaid value of the invoices, and that was how the judgment amount was reached.

> In the present case none of that is at issue. There's no question the goods were delivered, that some weren't paid for, that there were dollar values due. Mr. Hart alleges that they have now been paid, but now the question is: Were some of the goods defective? If they

were, were they returned in a timely and appropriate manner under the contract or the UCC? What was the value of the returned goods? And how much damages is Menard entitled to?

The factual analysis (sic) on those issues are different, and I am assuming that they were not litigated in the first case.

I agree wholeheartedly with the circuit court's decision that Liteway's suit for unpaid invoices involved claims and issues that were separate from Menard's current lawsuit for reimbursement for Liteway's defective products, involving Menard's remedies as a buyer under the UCC. Contrary to the majority's assertion that the only difference between the claims in the two actions is Menard's legal theory, *see* majority op., ¶¶ 32, 38, the circuit court correctly pointed out that the facts underlying the lawsuits were different. The claim for reimbursement for defective, damaged and unsatisfactory products returned to Liteway in the present action is distinct from the claim based on unpaid invoices that Liteway sought payment for in the first suit. Since the two lawsuits involved distinct facts, separate transactions and different legal theories for recovery, there is no identity of claims or causes of action.

¶ 63. The circuit court also addressed claim preclusion in light of the fact that the first suit ended in a default judgment, and that such judgments are not favored in the law. *Split Rock v. Lumber Liquidators*, 2002 WI 66, ¶ 64, 253 Wis. 2d 238, 646 N.W.2d 19. A default judgment can be a valid, final judgment for the purposes of claim preclusion. However, this court has held that a default judgment " 'does not extend to issues which were not raised in the pleadings.' " *A.B.C.G. Enters. v. First Bank Southeast*, 184 Wis. 2d 465, 481,

515 N.W.2d 904 (1994) (quoting *Klaus v. Vander Heyden,* 106 Wis. 2d 353, 359–60, 316 N.W.2d 664 (1982)). In commenting on a default judgment in a declaratory judgment action, this court stated: "To be actually litigated in this context, a matter must be pled with the sufficient clarity to give notice to the opposing party and the court of what claims are at stake so that they will understand the claims that will be barred in future litigation." *Nat'l Operating,* 244 Wis. 2d 839, ¶ 93.

¶ 64.  Because Liteway was granted judgment by default in the first lawsuit, the pleading the court must focus on for the purposes of claim preclusion is Liteway's complaint in that action, and it makes no mention of Menard's claims under the UCC, or of Menard's common-law claim for unjust enrichment. Liteway's complaint involving unpaid invoices set forth claims for breach of contract, for demand on an open account, for goods sold, and for bad faith. Liteway did not address any issue relating to Menard's rights to return defective, damaged and unsatisfactory products for credit under the UCC, or Menard's rights to recover for unjust enrichment. When the circuit court entered a default judgment for Liteway, it entered a default judgment on Liteway's claims asking for payment on its invoices to Menard. It did not enter a judgment that encompassed the issues of credit for the return of defective, damaged, and unsatisfactory products and for unjust enrichment.

¶ 65.  I do not dispute that " 'a final judgment is conclusive in all subsequent actions between the same parties . . . as to all matters which were litigated *or which might have been litigated. . . .*' " Majority op., ¶ 26. However, this statement must not be construed as strictly as the majority does. To do so results in one of two unfavorable and inappropriate outcomes: either

Wisconsin's permissive counterclaim statute is rendered meaningless, or the scope of what will be precluded after a default judgment is granted is expanded well beyond what is covered in a complaint such as Liteway's.

¶ 66.   It is important to emphasize, as the circuit court recognized, that default judgments have never been favored in the law. *See Split Rock,* 253 Wis. 2d 238, ¶ 64; *Miro Tool & Mfg., Inc. v. Midland Mach., Inc.,* 205 Wis. 2d 650, 663, 556 N.W.2d 437 (Ct. App. 1996). " '[T]he law prefers, whenever reasonably possible, to afford litigants a day in court and a trial on the issues . . .; and . . . default judgments are regarded with particular disfavor.' " *Shirk v. Bowling, Inc.,* 2001 WI 36, ¶ 16, 242 Wis. 2d 153, 624 N.W.2d 375 (quoting *Dugenske v. Dugenske,* 80 Wis. 2d 64, 68, 257 N.W.2d 865 (1977)). In this case, the majority seeks to deny Menard the relief it seeks on its UCC and unjust enrichment claims, after Menard proved during the trial before the circuit court that Liteway owes it $140,478.41 in reimbursements and costs, based on the return of defective, damaged and unsatisfactory products to Liteway.

¶ 67.   With the above principles in mind, I am convinced that the majority decision in *National Operating* controls this case. There, this court held that the original action filed by MONY, based on a contract, did not preclude a subsequent action by National Operating, based on the UCC. This court declined to apply the narrow exception to Wisconsin's permissive counterclaim statute to National Operating's action, because National Operating had a claim based on the UCC. Similarly, in this case, Liteway's suit focused on a claim based on unpaid invoices, a breach of contract claim, whereas the subsequent action by Menard was based

chiefly on the rights of a buyer to return defective, damaged or unsatisfactory products for credit, in accord with the UCC. The majority opinion inconsistently applies the reasoning of both *A.B.C.G. Enterprises* and *National Operating*, claiming that the distinguishing fact between *National Operating* and the present case is that Menard had returned all of the disputed products to Liteway before Liteway commenced its lawsuit. However, as I noted earlier, the record before the circuit court in this action contains evidence that there were 99 invoices dated after Liteway commenced its action on October 19, 2000. It is important that reimbursements for returned products continued for months after Liteway filed suit. The majority is clearly wrong when it asserts "that all the facts giving rise to Menard's suit were in existence at the time that Liteway filed its original action." Majority op., ¶ 38.

¶ 68.   Like the majority here, the court of appeals also failed to apply *National Operating* correctly to the case at bar. The court of appeals attempted to distinguish *National Operating* from this case, because *National Operating* involved a declaratory judgment rather than a claim for damages. *Menard*, 273 Wis. 2d 439, n.3. As noted earlier, in *National Operating*, the declaratory judgment action resulted in a default judgment, and this court held:

> In a declaratory judgment action, claim preclusion is limited to those matters that are actually litigated. To be actually litigated in this context, a matter must be pled with sufficient clarity to give notice to the opposing party and the court of what claims are at stake so that they will understand the claims that will be barred in future litigation.
>
> Here, there was a default judgment. By failing to answer the complaint, National Operating was conced-

ing every claim actually pleaded. But National Operating was not given fair notice in the complaint that MONY sought to extinguish *all* its rights. . . .

The declaratory judgment—a document drafted by MONY—granted precisely the relief sought in MONY's complaint, nothing more.

*Nat'l Operating,* 244 Wis. 2d 839, ¶¶ 93–95 (citation omitted). A default judgment, whether or not the action is one for declaratory judgment as in *National Operating,* is limited to those claims pled in the original complaint, and does not extend to matters not raised in the pleadings. *A.B.C.G. Enters.,* 184 Wis. 2d at 481 (quoting *Klaus,* 106 Wis. 2d at 359–60). Therefore, I remain convinced that Liteway's complaint was limited to contract claims, since it made no mention of extinguishing Menard's rights to credit for the return of defective, damaged and unsatisfactory products under the UCC. In the first action, Menard was not given any notice in Liteway's complaint that Liteway was attempting to extinguish all of Menard's rights as a buyer under the UCC, as well as any claim for unjust enrichment.

¶ 69.   Although the resolution of this case rests on whether there was an identity of claims or causes of action for purposes of claim preclusion, it is also necessary to highlight the majority's misinterpretation of Wisconsin's counterclaim statute. In Wisconsin, the joinder of counterclaims is permissive, not mandatory. Wisconsin Stat. § 802.07(1) states in relevant part: "[a] defendant *may* counterclaim any claim which the defendant has against a plaintiff, upon which a judgment may be had in the action." (Emphasis added.)

¶ 70.   I recognize, as does the majority, that this court has established a narrow exception to the permis-

sive counterclaim statute. In *A.B.C.G. Enterprises,* we stated that there is a " 'common-law compulsory counterclaim' rule which requires a defendant to counterclaim if its claim, when brought in a subsequent, separate action, would nullify the initial judgment or impair rights established in the initial action." *A.B.C.G. Enters.,* 184 Wis. 2d at 474. However, the court emphasized that the application of this "common-law counterclaim" rule is definitely an exception to the general rule and is meant to preclude a collateral attack when the attack would completely nullify the rights established in the first judgment.[3] *See id.* at 476–77. Specifically, it stated that the rule "applies *only* if a favorable judgment in the second action would nullify the judgment in

---

[3] One commentator stated:

Despite all its virtues, the common-law compulsory counterclaim rule, tucked away in an unfrequented cul-de-sac of the Second Restatement, does not seem to be sweeping the country. The Westlaw database indicates that only twenty-one cases have used the term "common-law compulsory counterclaim" in the thirty-one years since the rule's publication.

. . . .

So perhaps the common-law compulsory counterclaim rule is one of those rules constantly invoked in planning and discussing litigation, even though it seldom figures in a judicial opinion. But the rule does not appear to be in ubiquitous play, at least on any conscious level above intuition. For one thing, the twenty-one cases are concentrated geographically. Fifteen of them come from Wisconsin or the Seventh Circuit. The fact that the rule appears in opinions there but not elsewhere implies that the rule has not really caught on in the rest of the country. For another thing, the academy is not abuzz. The Westlaw database indicates that before this article catapulted the rule to title status, only two law review articles had used the term in any way. Kevin M. Clermont, *Common-Law Compulsory Counterclaim Rule: Creating Effective and Elegant Res Judicata Doctrine,* 79 Notre Dame L. Rev. 1745, 1756–57 (Oct. 2004) (footnotes omitted).

the original action or impair rights established in the original action." *Id.* (emphasis added). In this case, consistent with our holding in *National Operating,* the narrow exception should not be applied, because the test for its application is not met here. Menard's UCC and unjust enrichment claims would not nullify, but would merely reduce, the amount that Liteway would realize on its judgment. The majority opinion extends the compulsory counterclaim exception in a manner contrary to Wisconsin's permissive counterclaim statute, the UCC, and the public policy expressed by the legislature in its adoption of the UCC.[4]

¶ 71.   I conclude that the majority opinion causes significant problems for Wisconsin businesses. The majority's opinion encourages sellers to initiate litigation for unpaid invoices as soon as possible, because winning a judgment for price will bar the buyer's rights to revoke acceptance of defective or non-conforming goods, return the goods, and protect the buyer's interests upon return. The majority expands commercial "transactions" without regard to the buyer's rights under the UCC and obliterates a buyer's other potential

---

[4] The majority opinion's application of the common-law compulsory counterclaim rule expands well beyond the scope of what courts and commentators have deemed appropriate. In *Carey v. Neal, Cortina & Associates,* 576 N.E.2d 220 (Ill. App. Ct 1991), the Illinois Appellate Court chose not to apply the rule, explaining that "when analyzing the identity of causes of action for *res judicata* purposes, the second suit is not barred if the proof of its elements differ from the proof required to prove the prior action. *Id.* at 223. Notably, it asserted that [c]ourts should carefully examine the circumstances presented in a specific case to ensure that a party is not precluded from litigating a claim simply because it 'might have' been raised, if the nature of the claim is sufficiently separate from that which was actually litigated. *Id.* at 228.

claims, such as one for unjust enrichment. As stated above, the Wisconsin Legislature enacted the UCC in order to "permit the continued expansion of commercial practices through custom, usage and agreement of the parties." Wis. Stat. § 401.102(2)(b). The majority opinion, in contrast, only encourages acrimony and distrust between buyer and seller, and places Wisconsin in the unique and undesirable position of being a state that denies to buyers the remedies available under the UCC. Common sense leads me to conclude that $18 million worth of transactions over a six-year period, involving literally thousands of orders and returns, cannot be labeled as a single transaction for claim preclusion purposes, thus denying a Wisconsin business its rightful recovery of $140,478.41 for its claims under the UCC. This is the amount that the circuit court correctly determined was due to Menard.

¶ 72. For these reasons, I respectfully dissent.

¶ 73. I am authorized to state that Justice LOUIS B. BUTLER, JR. joins this dissent.